# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 6735 | **DATE** | 10/26/2001 |
| **CASE TITLE** | In Re: Westell Technolgies, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Enter Memorandum Opinion and Order regarding defendants' motion to dismiss [15-1]. The motion to dismiss is denied with respect to Count I insofar as it alleges securities fraud regarding misrepresentations made before August 2, 2000 against Westell, Zionts and Hindman. The motion is granted in all respects in favor Nelson, Albelda, Kirby and Reynolds and granted as to Westell, Zionts and Hindman as to statements made after August 2, 2000. The motion is also granted with respect to Count II of the complaint.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | 4 |
| ✓ | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | date docketed | OCT 3 0 2001 |
| | Docketing to mail notices. | docketing deputy initials | CM |
| | Mail AO 450 form. | | |
| | Copy to judge/magistrate judge. | date mailed notice | 10/26/2001 |
| MD | courtroom deputy's initials | mailing deputy initials | MD |
| | Date/time received in central Clerk's Office | | |

Document Number 32

FILED FOR DOCKETING
01 OCT 29 PM 5: 15

DOCKETED

OCT 3 0 2001

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

IN RE WESTELL TECHNOLOGIES, INC.,   )
SECURITIES LITIGATION            )      00 C 6735
                                   )

## MEMORANDUM OPINION AND ORDER

Lead plaintiff, Fuller & Thaler Asset Management, Inc., has sued individually and on behalf of a class of purchasers of common stock of defendant Westell Technologies, Inc. ("Westell") between the dates of June 27, 2000 and October 18, 2000, alleging that Westell and a number of its directors and officers[1] violated §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated under § 78j(b), 17 C.F.R. § 240.10b-5, by knowingly and/or recklessly making false and misleading statements to plaintiff through press releases and conversations with analysts. Plaintiff[2] further alleges that defendants Marc Zionts ("Zionts"), William Nelson ("Nelson"), Howard Kirby, Jr. ("Kirby"), Nicholas Hindman ("Hindman"), and Thomas Reynolds ("Reynolds") profited from these misrepresentations, in that they sold off their personal holdings to plaintiff after they artificially inflated the price of Westell stock. Defendant Bruce Albelda ("Albelda"), Westell's head of Investment Relations Department, although not alleged to have

---

[1] At all pertinent times, the directors and officer defendants held the following positions at Westell: Marc Zionts ("Zionts") was Chief Executive Officer ("CEO") and a director; William Nelson ("Nelson") was President, Chief Operating Officer ("COO"), and a director; Nicholas Hindman ("Hindman") was Vice President, Chief Financial Officer ("CFO") and Secretary-Treasurer; Bruce Albelda ("Albelda") was head of the Investment Relations Department and spokesperson to shareholders and analysts; Howard Kirby, Jr. ("Kirby") was a director; and Thomas Reynolds ("Reynolds") was a director.

[2] The word "plaintiff" refers to the lead plaintiff and the putative class.

personally profited, is sued for making false and misleading statements. All defendants have moved to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted and 9(b) for failure to plead fraud with particularity. For the reasons articulated below, the court grants the motion in part and denies it in part.

## MOTION TO DISMISS STANDARDS

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of the complaint for failure to state a claim upon which relief may be granted. *Gen. Elec. Capital Corp.* v. *Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). Dismissal is appropriate only if it appears beyond a doubt that the plaintiff can prove no set of facts in support of its claim that would entitle it to relief. *Conley* v. *Gibson*, 355 U.S. 41, 45-46 (1957); *Kennedy* v. *Nat'l Juvenile Det. Ass'n*, 187 F.3d 690, 695 (7th Cir. 1999). In ruling on the motion, the court accepts as true all well pleaded facts alleged in the complaint, and it draws all reasonable inferences from those facts in favor of the plaintiff. *Jackson* v. *E.J. Brach Corp.*, 176 F.3d 971, 977 (7th Cir. 1999); *Zemke* v. *City of Chicago*, 100 F.3d 511, 513 (7th Cir. 1996).

In addition to the mandates of Rule 12(b)(6), Federal Rule of Civil Procedure 9(b) requires "all averments of fraud" to be "stated with particularity," although "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." "The rule requires the plaintiff to state the identity of the person who made the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Vicom, Inc.* v.

*Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994); *see also DiLeo* v. *Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) ("Although states of mind may be pleaded generally [under Rule 9(b)], the 'circumstances' must be pleaded in detail. This means the who, what, when, where, and how: the first paragraph of any newspaper story."). "'Because only a fraction of financial deteriorations reflects fraud,' . . . plaintiffs in securities cases must provide enough information about the underlying facts to distinguish their claims from those of disgruntled investors." *Arazie* v. *Mullane*, 2 F.3d 1456, 1458 (7th Cir. 1993) (quoting in part *DiLeo*, 901 F.2d at 628).

Further, in addition to Rule 9(b), the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b), imposes "heightened pleading requirements" to discourage claims of "so-called 'fraud by hindsight.'" *In re Brightpoint, Inc. Sec. Litig.*, No. IP99-0870-C-H/G, 2001 WL 395752, at *3 (S.D. Ind. Mar. 29, 2001). Section 78u-4(b) "requires a court to dismiss a complaint that fails to (1) identify each of the allegedly material, misleading statements, (2) state facts that provide a basis for allegations made on information and belief, or (3) state with particularity 'facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id.* at *4.

## FACTS

Plaintiff's consolidated class action complaint alleges the following facts, which are taken as true for purposes of this motion: Defendant Westell, a Delaware corporation headquartered in Aurora, Illinois, provides digital and analog products to telephone companies primarily for use in the delivery of high speed data to users over existing telephone wires. Westell provides three business products: (1) Customer Premises

Equipment ("CPE") products, (2) Transport Systems, and (3) Telco Access Products. The key component of Westell's success is its CPE unit, which develops and manufactures Digital Subscriber Line ("DSL") modems to provide high-speed internet access to residential and small business users. The majority of Westell's CPE sales stems from the sale of DSL modems to SBC Communications Inc. ("SBC"), Verizon Communications, and British Telecommunications, three large telecommunications companies.

On June 27, 2000, when Westell stock was trading at about $14 or $15 per share, Westell issued a press release stating that it was expanding its line of modem products. On June 28, 2000, Westell issued another press release touting expanding demand for its DSL products and announcing that it was adding a manufacturing partner and that its Aurora plant was running at full capacity. On June 29, 2000, Barry Sine ("Sine") and Clifton Gray ("Gray"), stock analysts from Kaufman Bros. who covered Westell, issued a report after speaking with Westell, that based on "massive demand for DSL services by Westell's customers," they were raising revenue estimates for the first and second quarters and issued a "strong buy" recommendation. Westell stock reacted by gaining 12% to end the day trading at $15 per share. On July 7, another analyst, Joseph Bellace ("Bellace") of Jefferies & Co., issued a "buy" rating with a 12-month target share price of $50, and, after consulting with "Westell management," increased his revenue estimates for fiscal year 2001 from $400 million to $425 million, the highest estimate in the investment community. Westell stock gained 23% to close at $19 per share on that day.

4

On July 17, Gray appeared on a "RadioWallStreet" investor broadcast and stated that after conversations with "the Company's management," he had learned that Westell had entered into an unannounced new supply order with SBC, its largest customer, and based on this business would meet its sales forecasts of $65-$70 million in CPE sales for the second quarter (ending September 30). Westell then issued a press release on July 18 stating that SBC had again chosen Westell as a provider of DSL modems. On July 19, Westell issued another press release stating that the first quarter revenue for fiscal 2001 had been $107 million, $61.9 million coming from CPE sales. "Hindman stated that the Company was 'delighted with our record quarter,' and that Westell had 'demonstrated significant top-line growth in our equipment business and DSL revenues climbed to 63% of revenues from 46% in the prior quarter." (Compl. ¶ 39.)[3] Based on these statements, Gray and Sine reiterated their "strong buy" recommendation on July 20, forecasted a 12-month share price target of $65, and increased their CPE revenue projection for the second quarter of 2001 from $45 million to $80 million. Another analyst, Reggie King ("King") of Chase, Hambrect & Quist Inc., issued a "buy" report on July 21 with a forecasted 12-month share price target of $70. Westell stock was trading at about $28 per share on July 21, but climbed to $30.1875 per share on July 25.

The June 28, July 18 and July 19 Westell press releases, and the June 29, July 7, and July 17 analyst statements, were allegedly all false and misleading because defendants knew "as early as June 2000" that SBC was experiencing difficulties in the installation of DSL lines due to new regulatory guidelines, which had caused SBC's DSL

---

[3] Although not specifically stated in the complaint, the court will infer that Hindman's statement was made in the July 19 press release.

installation rate to drop from 8,000 to 9,000 lines per day to about 1,000 lines per day. This slower pace meant that SBC would not be selling as many modems and, therefore, would not be purchasing as many from Westell during the second fiscal quarter of 2001. Additionally, "by mid-summer 2000" this problem had created a massive inventory buildup of over 200,000 Westell modems in SBC's warehouse. "This information was reported to defendants by Brian Powers, the head of sales at Westell, and by Ray Sims, Westell's head of customer service, both of whom reported directly to Nelson, the Company's President." (Compl. ¶ 47.)

Between the dates of July 21 and August 1, 2000, at unusual times in relation to their prior trading history, defendants Zionts, Kirby, Reynolds, and Hindman sold "highly unusual quantities" of their personal holdings of Westell common stock for prices ranging between $22.79 and $30 per share: Zionts, 172,500 shares (50% of his holdings, realizing over $5.5 million), Kirby 80,000 shares (19% of his holdings, realizing over $2.0 million), Reynolds 27,200 shares (30% of his holdings, realizing $0.77 million), and Hindman 4,000 shares (realizing $41,220). Defendant Nelson, without reference to his prior trading history, is alleged to have sold 100,000 shares (28% of his holdings, realizing over $2.7 million). Defendant Albelda did not sell any stock during this time.

On August 2, 2000, analyst Bellace reported that, beginning in June 2000, SBC had changed its installation procedures to comply with new regulations, that this change had slowed the pace of installations, that SBC was not selling as many Westell modems as it previously had, and that SBC's inventory of Westell modems had been building

6

substantially in June and July, 2000. (Compl. ¶ 46.[4]) As a result of this information, Westell stock declined 14% from $18-7/16 to $15-7/8 per share on August 3.

Defendants downplayed the effect that these problems would have on Westell's revenue and falsely assured investors that it would reach predicted levels. Specifically, Zionts stated on August 3 during an interview on CBS MarketWatch that while he had concerns about SBC's ability to keep up with installation demand, he thought this would not adversely affect Westell's September quarter and that Westell had no concerns about keeping up with demand for its modems. Zionts also stated, "Within the DSL modem business, I actually feel good about most of our big customers. . . . We did a tremendous amount of business with SBC last quarter. They could have installed more lines than they did, but operational issues prevented them from installing more than they did." (Compl. ¶ 49.) Westell stock reacted by gaining 7% to close at $17.056 per share on August 4.

On August 4, Albelda and/or Zionts spoke with Syed Haider ("Haider"), an analyst at Frost Securities, and told him that Westell's expected second quarter earnings were still in line with forecasts and that they would warn investors before September 20 if they learned that earnings would fall short of the forecasts. Haider then issued a "buy" report forecasting a 12-month share price target of $80. On August 7, Sine and Gray reported that after discussions with "Westell's management," they learned that July results were in line with expectations, reiterated their "strong buy" ratings, and kept their second quarter revenue projections for Westell's CPE unit at $80 million. On the same

---

[4] The court reads ¶ 46 to mean that Bellace reported all of the information contained in the paragraph, not merely the change in SBC's procedures.

day, "defendants" assured Charles Pluckhahn, an analyst from Stephens Inc., that Westell would meet his projections of $70 million in CPE revenues for the second quarter and Pluckhahn issued a "buy" report forecasting a 12-month share price target of $40. Westell was trading at about $17 per share on August 7.

Also "in early August 2000," Westell participated in a road show with Kaufman Bros. analysts where they "informed investors that although SBC was experiencing a slowdown in DSL line installations, SBC would not cause Westell to have a shortfall in its CPE sales for the second quarter." (Compl. ¶ 50.) Around this same time, SBC informed Westell that it would place fewer orders with Westell and, instead, purchase more modems from Westell's main competitor because it was angry that Westell was publicly discussing its installation difficulties. Albelda's and Zionts's August statements, along with statements made at the early August road show and to or by analysts in August were allegedly all materially false and misleading for the same reasons rendering previous statements false and misleading and, additionally, because SBC had informed Westell that it would be purchasing modems from Westell's main competitors.

On August 14, the following exchange occurred on public television's Nightly Business Report:

> **Diane Eastabrook, Nightly Business Report Correspondent [("Eastabrook")]:** Since last fall, employees of Westell Technologies have been working around the clock assembling modems and networking equipment for digital subscriber lines. Westell has been flooded with orders from telecom companies that are trying to meet the crushing demand for broadband service.
>
> **Marc Zionts, ["Chief Executive Officer"] CEO, Westell Technologies [("Zionts")]:** Our belief is that broadband is a service that ultimately will be like television.

> **Eastabrook**: In the company's first quarter, which ended June 30[th], sales of Westell's DSL hardware soared to nearly $68 million from a paltry $3.5 million during the same period last year. Westell says it has the production capability of producing about seven times more DSL equipment this year than it did last year so it can go a long way in meeting the growing demand by consumers for digital subscriber lines. But some of Westell's largest customers, like the newly created Verizon Communications and SBC Communications are having a tough time keeping up with the avalanche of broadband orders. Analysts say some investors fear inventories of DSL hardware could be building up at the phone companies and that is why Westell's stock has been so volatile over the past couple of months. But Zionts is confident the telecom companies will eventually be able to work through their backlog of orders.
>
> **Zionts**: I think that they'll have, that they'll run into bumps on the road and that it takes them a little time to solve them and they keep going. And if you smooth out the trend, it's going to be this, you know, linear or logarithmic growth will continue.

(Compl. ¶ 56.) Analyst Anton Wahlman of UBS Warburg was also interviewed for this Nightly Business Report and "stated that Westell would benefit from the booming broadband industry and predicted 'strong revenue growth again this quarter.'" (Compl. ¶ 57.)

On or about August 21, Haider issued a report stating that Westell's CPE unit likely would fall short of its sales projections due to inactivity by a major customer. In response, Zionts and/or Albelda reassured the analyst that the SBC issues had been resolved, that DSL installation rates were back to normal levels, that they expected the order activity from SBC to increase, and that second quarter numbers were still in line with forecasts. They again stated that they would disclose prior to September 20 if they anticipated any problems in meeting the forecasts. Haider then issued a "strong buy" forecasting a 12-month target price of $80. Westell stock was trading at about $16 per share on August 21. Zionts's and/or Albelda's statements to Haider, along with Zionts'

statements on the August 14 Nightly Business Report, were allegedly false and misleading because these defendants knew that SBC had decreased its orders and this slowdown would negatively affect Westell's CPE revenues for the second fiscal quarter of 2001.

On September 7, Westell issued a press release stating that its CPE unit is now the world-wide leader in desktop modem sales, and that during the second quarter, Westell had jumped from fifth to second place in overall DSL modem shipments. Westell issued another release on September 12 announcing a new product, and Westell stock reacted by gaining 15% to close at $16 per share. Also on September 12, Zionts and Albelda participated in a road show with Kaufman Bros. analysts and met with Kaufman Bros. institutional clients in New York City. "At the road show, Zionts and Albelda stated that they were 'comfortable' with their guidance for the current quarter which included CPE revenues of $65-$75 million," and that the SBC slowdown would have a limited effect on modem sales in the second quarter because other business could make up for the lost revenue. Based on these statements, Kaufman Bros. analyst Gray published a report with a "strong buy" recommendation for Westell stock and projecting a 12-month target price of $65 per share. The report also stated that Westell had reiterated its guidance for the current quarter and acknowledged that the SBC slowdown would have a limited effect on revenue. Westell common stock traded at $16 per share on September 12.

At a DSL industry conference hosted by Kaufman Bros. on September 18, Hindman stated that Westell was on track and felt comfortable with its predictions of $65-$75 million in CPE revenues for the second quarter. The statements made by Westell in the two September press releases, by Zionts and Albelda at the September 12

10

road show, and by Hindman during the September 18 DSL industry conference were

materially false and misleading for the same reasons that prior statements were false and

misleading; namely, that SBC was having installation difficulties, possessed a massive

inventory buildup of modems, and would place more future modem orders from

Westell's competitor.

On October 18, 2000, Westell issued a press release stating that its CPE revenues

for the second quarter were only $49.5 million. As a result of the news, Westell stock

decreased 34% from $9 per share at the close of trading on October 18 to $5.94 per share

at the close of trading on October 19.


## ANALYSIS

Section 10(b) of the Securities Exchange Act of 1934 provides,

> It shall be unlawful for any person, directly or indirectly, by the use of any
> means or instrumentality of interstate commerce or of the mails, or of any
> facility of any national securities exchange . . . [t]o use or employ, in
> connection with the purchase or sale of any security . . . [,] any
> manipulative or deceptive device or contrivance in contravention of such
> rules and regulations as the [Securities and Exchange] Commission may
> prescribe as necessary or appropriate in the public interest or for the
> protection of investors.

To establish liability under section 10(b) and Rule 10b-5, plaintiff must prove that "(1)

the defendant made a false statement or omission (2) of material fact (3) with scienter (4)

in connection with the purchase or sale of securities (5) upon which the plaintiff

justifiably relied (6) and that the false statement proximately caused the plaintiff's

damages." *Caremark, Inc.* v. *Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir.

1997). The Private Securities Litigations Reform Act of 1995 ("PSLRA") also requires

that a complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1), and "state with particularity facts giving rise to a strong inference that the defendants acted with the requisite state of mind," 15 U.S.C. § 78u-4(b)(2). Defendants contend that plaintiff has failed to properly plead all elements but the fourth under the applicable pleading standards.

1. *False Statements or Omissions of Material Fact*

A material misrepresentation is found where a defendant "either made a false statement of material fact or failed to make a statement of material fact thereby rendering the statements which were in fact made misleading." *Searls* v. *Glass*, 64 F.3d 1061, 1065 (7th Cir. 1995). A statement is material if it would be viewed by "a reasonable investor as significantly altering the total mix of available information." *In re Newell Rubbermaid Inc. Sec. Litig.*, No. 99 C 6853, 2000 WL 1705279, at *14 (N.D. Ill. Nov. 14, 2000) (citing *Basic Inc.* v. *Levinson*, 485 U.S. 224, 231-32 (1988) and *Parnes* v. *Gateway 2000, Inc.*, 122 F.3d 539, 546 (8th Cir. 1997)).

Plaintiff's complaint contains two distinct categories of alleged misrepresentations: statements made prior to August 2, alleged to have been misleading because they omitted the fact that SBC was having problems and would be ordering fewer modems from Westell; and statements and predictions made after the August 2 news that SBC was experiencing installation problems, alleged to have been misleading because the defendants downplayed without reasonable basis the effect that SBC's difficulties would certainly have on Westell. As to both categories, defendants contend that each alleged misrepresentation and omission cited by the plaintiff is insufficiently

12

pled under Rule 9(b) and the PSLRA, all hinging on a factually unsupported assertion that unspecified "defendants" knew of an imminent slowdown at SBC as early as June, 2000. The court will discuss the two groups of statements separately.[5]

### A. *Pre-August 2 Statements*

Prior to August 2, plaintiff attributes six separate statements to one or more defendants:

1. On June 28, press release announces Westell had added a new manufacturing partner and Aurora plant was running at full capacity (not forward looking);

2. On June 29, analyst raises revenue estimate after conversations with "the Company";

3. On July 7, analysts report via Westell that there was "massive demand" from Westell's customers and that SBC was its "largest account" and that Westell was raising revenue estimates";

4. On July 17, based on conversation with "management," analyst announces Westell's new supply order with SBC, indicating Westell would meet second quarter revenue projection;

5. On July 18, press release announces Westell "had been selected by SBC as one of its providers for DSL modems," describing SBC as the leading supplier of DSL

---

[5]Although not recited in the facts section above, each of the press releases contained a "'Safe Harbor' statement under the [PSLRA]," which warned that certain statements contained in the release involve risks and uncertainties, followed by a recitation of risks. Defendants contend that all the press releases were forward looking statements accompanied by meaningful cautionary statements identifying important facts that could cause actual results to differ; thus, invoking the "safe harbor" of 15 U.S.C. §78u-5(c)(1)(A)(i). Plaintiff does not respond to this argument other than to say the "forward-looking statements to analysts are actionable. . . ." The court takes plaintiff's response as a concession that any forward looking statements contained in the press releases are within the safe harbor.

service and otherwise praising both its own product (not forward looking) and SBC's deployment plans (forward looking); and

      6. On July 19, press release quotes Hindman as touting its record first quarter earnings (not forward looking), causing analysts to increase revenue and price projections.

      Defendants argue that plaintiff has not adequately pled why each of the statements is false, as they must under the PSLRA, 15 U.S.C. §78u-4(b)(1). They contend that all that is alleged concerning the pre-August 2 statements is that at some unknown point, as early as June, Westell somehow knew that something was happening at SBC. Further, they point out that none of the press releases projected SBC sales or addressed Westell's CPE revenues. Plaintiff responds that defendants' sin was their omission, in that they painted a falsely positive picture of Westell's prospects when they knew, by early June 2000, that due to SBC's slowdown, SBC would be decreasing its orders from Westell. Consequently, defendants knew but omitted to disclose that Westell would not meet the guidance defendants had provided to analysts for sales in its CPE unit of $65-$70 million in the second quarter. Plaintiff contends that defendants had a duty to make this disclosure.

      "[T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *Lindelow* v. *Hill*, No. 00 C 3727, 2001 WL 830956 (N.D. Ill. July 20, 2001). Defendants cannot be liable unless they had a duty to disclose. "A duty to disclose non-public material information arises when (a) disclosure is needed to make a prior statement not misleading; (b) defendant engages in insider trading; or (c) defendant

14

causes rumors linked to unusual market activity." *Holstein* v. *Armstrong*, 751 F. Supp. 746, 748 (N.D. Ill. 1990). A misleading statement is material if there is "'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *In re Brightpoint, Inc. Sec. Litig.*, 2001 WL 395752 (quoting *Basic Inc.*, 485 U.S. at 231-32). The cited cases from this district in which motions to dismiss have been denied entailed overstating income by mischaracterizing research and development expenditures as "intangible assets," coupled with unusual insider trading, *Chu* v. *Sabratek,* 100 F. Supp. 2d 827 (N.D. Ill. 2000); overstating revenues in violation of generally accepted accounting principles, while ignoring several "red flags" indicating the fact and risk of inflated revenue recognition, *Retsky Family Ltd. P'ship* v. *Price Waterhouse LLP*, No. 97 C 7694, 1998 WL 774678 (N.D. Ill. Oct. 21, 1998); knowingly or recklessly announcing grandiose goals without having taken material steps to accomplish them, *Lindelow*; release of positive news while omitting information that half of the contracts on which profitable projections had been made were in jeopardy, coupled with unusual insider trading, *In re Spyglass, Inc. Sec. Litig.*, No. 99 C 512, 1999 WL 543197 (N.D. Ill. July 21, 1999); knowingly or recklessly failing to reveal in Securities and Exchange Commission ("SEC") filings and press releases that, for nine quarters, defendant artificially inflated reported earnings and profits, *In re Anicom Inc. Sec. Litig.*, No. 00 C 4391, 2001 WL 536066 (N.D. Ill. May 18, 2001); and conscious or reckless misrepresentation of known net income and credit losses in SEC filings while making repeated public statements assuring investors of the reliability of its financial reports, *Rehm* v. *Eagle Finance Corp.*, 954 F. Supp. 1246 (N.D. Ill. 1997).

Unlike most of the cited cases above, this case is not about objectively ascertainable misinformation. Rather, it can best be compared with *Lindelow* and *In re Spyglass, Inc. Sec. Litig.*, where defendants were accused of creating unjustifiable excitement about the company's prospects. Disregarding scienter for the moment, if SBC was the centerpiece of Westell's prosperity and Westell's top managers knew that sales to SBC would certainly drop precipitously, then the court finds it reasonable to infer that the optimism defendants focused on SBC before August 2 was misleading. That several defendants engaged in insider trading shortly before the information became public reinforces this conclusion.

B.   *Post-August 2 Statements*

The statements made after August 2 present a somewhat different picture. On August 3, Zions acknowledged concerns about SBC but insisted it would not cause a shortfall in Westell's sales for the second quarter. On August 14, Zions again acknowledged problems associated with installation services but assured listeners that it would eventually smooth out; on August 21, after an announcement that sales had faltered, Zions and/or Albelda stated the SBC issues had been resolved, that installation rates were back to normal levels, that they expected order activity from SBC to increase, and that second quarter revenues were still in line with projections. In September, they assured analysts that other business could make up for the lost revenue from SBC and Westell was still on track. There was no announcement, as promised, by September 20, that a shortfall was anticipated, but on October 18, Westell announced that rather than the $65-$75 million projected, revenues for the second quarter were only $49.5 million. Plaintiff contends that these statements were all misleading because defendants lacked

16

any countervailing factual basis to assure the investment community that Westell would meet its earnings expectations for the second quarter of 2001.

These releases, along with statements made to or by analysts and by Zionts and/or Albelda, were issued after an analyst had publicly disclosed SBC's problems and after the drop in purchases from Westell. "A plaintiff cannot credibly claim to be misled by a company's attempt to hide negative information when that same information is publicly available via alternate channels." *Chu*, 100 F. Supp. 2d at 834 (citing *Eckstein v. Balcor Film Investors*, 58 F.3d 1162, 1169 (7th Cir. 1995)); *see also Clark* v. *TRO Learning, Inc.*, No. 97 C 8683, 1998 WL 292382, at *6 (N.D. Ill. May 20, 1998). Plaintiff contends, however, that statements made after August 2 are not actionable because they failed to disclose the SBC slowdown, "but rather, the statements <u>omitted to disclose that due to the slowdown, Westell would not meet its sales forecasts for its CPE unit</u>." (Resp. at 8 (emphasis in the original).) This distinction, however, lacks persuasive force as plaintiff's argument inherently relies on SBC's slowdown as the reason the post-August 2 statements were misleading. At any point after Bellace's August 2 statement, SBC's problems were public knowledge and, therefore, part of the total mix of information available to the investor who wished to assess the effect on Westell. A reasonable investor who relied before August 2 on defendants' touting the centrality of SBC would certainly have understood that the disclosure was ominous news. *See Zoghlin* v. *Renaissance Worldwide, Inc.*, No. 99 C 1965, 1999 WL 1004624, at *8 (N.D. Ill. Nov. 4, 1999) ("Sophisticated investors, such as [plaintiff], are expected to 'understand the limits of a projection.' In short, '*caveat emptor*' applies equally, if not more, in the securities market." (citation omitted.)). In addition, plaintiff alleges not only that Bellace, and

17

others in August, disclosed SBC's problems and its likely effect on Westell, but also that Westell stock declined 14% immediately after this information was disclosed, which suggests that the disclosure did affect investors. Comfort statements made in reaction to acknowledged problems are cold comfort which a reasonable investor would assess skeptically. For this and the other reasons set out above, the court will dismiss the complaint insofar as it attempts to state a claim for statements made after the August 2 disclosures.

2.    *Pleading Culpability of Each Defendant*

Defendants object to the failure of plaintiff to specify who made the allegedly false statements to the analysts or who in the corporation put his imprimatur on the specific projection reported, citing *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 934 (9th Cir. 1996) ("In order to be liable for unreasonably disclosed third-party forecasts, defendants must have put their imprimatur, express or implied, on the projections. The complaint must state particular facts as required by Rule 9(b)" (citations and quotations omitted.)),[6] and *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 265 (2d Cir. 1993) (Rule 9(b) requires, at a minimum, that the plaintiff identify the speaker of the allegedly fraudulent statements. Completely unattributed statements, even made on information and belief, are insufficient. (citations and quotations omitted.)). Further, defendants argue that defendants Nelson, Kirby and Reynolds are not alleged to have made any statements, so they should certainly be dismissed from the complaint.

---

[6] The court also cited *In re Caere Corporate Sec. Litig.*, 837 F. Supp. 1054, 1059 (N.D. Cal.1993), for the proposition that "adoption occurs when a defendant 'sufficiently entangled himself with the analysts' forecasts'; '[there are] sound reasons to construe the entanglement requirement strictly'." *Id.*

Plaintiff responds that he has identified the individuals involved in the alleged misrepresentations, as narrowly as is practicable without discovery, as Zionts, Albelda, or Hindman and/or "Westell management," which encompasses the individual defendants. Plaintiff relies on a number of cases from this district which, in general, stand for the proposition that fair notice of the claims is all that is required, *see, e.g., Market St. Sec.* v. *Racing Champions Corp.*, No. 00 C 3267, 2000 WL 1727788 (N.D. Ill. Nov. 21, 2000), and that plaintiff cannot be required to plead facts exclusively within the defendants' control or otherwise unavailable to it, *see In re Newell Rubbermaid Inc. Sec. Litig.*, 2000 WL 1705279, at *14. In addition, because the conversations between a person at Westell and a journalist are confidential, plaintiff believes it is not required to name the precise source of the journalist's information within the company. *See id.*

"A complaint that attributes misrepresentations to all defendants, lumped together for pleading purposes, generally is insufficient." *Sears v. Likens*, 912 F.2d 889, 892 (7th Cir. 1990) (citations omitted.). Nevertheless, where press releases are concerned, a reasonable inference can be drawn that Westell's spokesperson made the statement as authorized by one or more members of top management, an inference not inconsistent with *In re Syntex Corp. Sec. Litig* or *In re Time Warner Inc. Sec. Litig.* on which defendants rely. Similarly, the court agrees with plaintiff that an analyst's source is not someone that a plaintiff could typically identify with particularity. As Judge Kennelly stated in a similar context in *In re Newell Rubbermaid Inc. Sec. Litig.*, "[i]t is well established in this Circuit that a party may be excused from Rule 9(b)'s requirement of pleading with particularity if the information that he is required to plead rests exclusively within the defendants' control or is otherwise unavailable to him." 2000 WL 1705279, at

*14. Where, as here, the plaintiff has narrowed the possible sources of information to

Westell's CEO, Chief Financial Officer ("CFO"), and the head of Investment Relations,

the court finds that plaintiff has sufficiently pled who made the alleged

misrepresentations.[7] Although the complaint does not specifically plead lack of access to

information, it is plain enough here that the statements to analysts that were not publicly

attributed are not likely to be available to plaintiff without discovery. *See id.* at *14

("We can see no good reason why a defrauded person's right to maintain an action ought

to turn on whether an analyst is willing to volunteer the source of his information to a

plaintiff's attorney planning litigation. And there is nothing in the Federal Rules of Civil

Procedure or the PSLRA which requires a securities fraud plaintiff to be a mind-reader or

have a 'mole' feeding him inside information."). Nothing in the complaint, however,

points to Nelson as a declarant of any of the statements at issue. Further, there is no basis

to infer from the allegations that members of the board of directors, Kirby and Reynolds,

were involved in making any statement. Thus, these three individual defendants will be

dismissed from the complaint.

---

[7] The court acknowledges plaintiff's assertion (in a footnote) that the complaint is sufficient under what some courts have termed the "group pleading" doctrine, which allows plaintiff "to rely on the presumption that certain statements of a company, such as financial reports, prospectuses, registration statements, and press releases, are the collective work of those high-level individuals with direct involvement in the everyday business of the company." *Sutton* v. *Bernard*, No. 00 C 6676, 2001 WL 897593, at *5 n.5 (N.D. Ill. Aug. 9, 2001). The viability of this doctrine after the PSLRA's enactment has been debated by courts within this district, and the Seventh Circuit has yet to rule. *See Lindelow* v. *Hill*, No. 00 C 3727, 2001 WL 830956, at *7 (N.D. Ill. July 20, 2001) ("Judges of this District have . . . been unable to agree as to what is required to attribute fraudulent statements to corporate directors.") (citing *Dardick* v. *Zimmerman*, 149 F. Supp. 2d 986, 987 (N.D. Ill. 2001)); *In re Anicom Inc. Sec. Litig.*, No. 00 C 4391, 2001 WL 536066 , at *6 (N.D. Ill. May 18, 2001) ("The Seventh Circuit has not ruled on the applicability of 'group pleading' following the more stringent pleading requirements of the PSLRA. The courts are split on whether it still exists."). The court prefers the approach of Judge Shadur in *Dardick*, in which the Judge states the "proper course" is to examine each individual's liability based on "defendant's own conduct (or, where applicable, on respondeat superior principles)."

3.    *Scienter with respect to pre-August 2 Statements*

Scienter "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Rehm*, 954 F. Supp. at 1253 (citing *Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)); *see, e.g., Sutton* v. *Bernard*, No. 00 C 6676, 2001 WL 897593, at *6 (N.D. Ill. Aug. 9, 2001); *Lindelow*, 2001 WL 830956, at *6. "Reckless conduct is, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rehm*, 954 F. Supp. at 1255 (citing *Rolf* v. *Blyth, Eastman Dillion & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)).

Allegations that a corporate insider delayed disclosing materially adverse information in order to sell personally-held stock at a huge profit can supply the requisite motive for a scienter allegation. *Id.* at 1254. Some courts have stated that plaintiff must also show that a defendant engaged in unusual trading activity, meaning the defendant traded "in amounts dramatically out of line with prior trading practices, at times calculated to maximize personal benefit from undisclosed inside information." *Id.* (quoting *Marksman Partners, L.P.* v. *Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1312 (C.D. Cal. 1996)); *see In re System Software Associates, Inc.*, No. 97 C 00177, 2000 WL 283099, at *13 (N.D. Ill. Mar. 8, 2000). The precise form of insider trading is not statutorily defined, nor has the Seventh Circuit ruled on the issue. As Judge Hamilton pointed out in *In re Brightpoint, Inc. Sec. Litig.*, a "strong inference of scienter may arise

where the complaint sufficiently alleges that the defendants benefitted in a concrete and personal way from the purported fraud, . . . knew facts or had access to information suggesting that their public statements were not accurate, or failed to check information they had a duty to monitor." 2001 WL 395752, at *13 (citing *Novak* v. *Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000)). Plaintiff alleges that Zionts sold half of his Westell holdings, reaping proceeds of $5.5 million, or ten multiples of his salary. If plaintiff establishes that the information attributable to Zionts was material and misleading, then a fact finder could infer that he acted with scienter by "unload[ing] a massive 50% of his Westell holdings." (Compl. ¶ 71.) Although Nelson is alleged to have sold 28% of his holdings, there is no allegation that this trading was unusual.[8] But the fact that he sold a large amount, on the same day as co-defendants Zionts, Reynolds and Kirby, coupled with his knowledge about SBC, suggests both a motive and an opportunity to maximize personal gain before the news about SBC became public, from which a strong inference could be drawn that the information known by insiders was used to benefit insiders before that information became public.[9]

On the other hand, Hindman, who can be directly linked to the press releases, sold only 4,000 shares. More significantly, plaintiff does not allege, as he does with Zionts, Nelson, Reynolds, and Kirby, that Hindman unloaded huge amounts of his personal holdings of Westell common stock. (Compl. ¶ 71.) Thus, although he may have had

---

[8] Plaintiff alleges that Zionts, Reynolds, and Kirby had not sold any shares during the preceding year-and-a-half. What Nelson's prior activity had been is not alleged.

[9] Nelson, as the COO, is alleged to have been told in early June about the downturn at SBC. By virtue of his position, it is fair to infer that this information was shared with others at the helm of Westell. Although as indicated above, Nelson has not been adequately identified as a speaker of the misleading statements, his knowledge and insider trading permits a strong inference of scienter as to Zionts and Westell.

motive and opportunity, the sale of 4,000 shares without more does not permit an inference of scienter based on insider trading. Albelda, the defendant arguably most connected with alleged misrepresentations made to analysts, sold no stock, so no inference of scienter can be based on insider trading as to Albelda.

Hindman and Albelda, then, must be subjected to the "strong circumstantial evidence" test. *Rehm*, 954 F. Supp. at 1255. Hindman, as the CFO, was in a position to know that sales to SBC, its primary customer, were falling, yet on July 19 he expressed delight with Westell's record first quarter and noted the increase in DSL revenues, leading analysts to increase revenue projections. Under the circumstances, this conduct permits a strong inference that the danger of misleading the public was either known to Hindman or so obvious that he must have been aware of it. With respect to Albelda, as indicated above, he was not an officer of the corporation and not among those alleged to have control of the content of public statements issued by Westell. Thus, the facts alleged do not constitute strong circumstantial evidence that Albelda acted with scienter, and Albelda will be dismissed from the complaint.

4.  *Reliance and Causation*

Defendants argue that plaintiff has not adequately pled reliance because defendants never represented the amount of anticipated SBC or second quarter revenue before August 2 and they have not adequately pled causation of any losses. Plaintiff responds that this pleading requirement is not a difficult one and "ought not place unrealistic burdens on the plaintiff at the initial pleadings stage." *Danis* v. *USN Communications, Inc.*, 73 F. Supp. 2d 923, 943 (N.D. Ill. 1999) (quoting *Caremark*, 113 F.3d at 649). The complaint alleges a "fraud on the market" theory of reliance, such that

plaintiff's losses resulted from paying an artificially inflated price for Westell stock due to the misrepresentations and omissions made by defendants through the class period. Specifically, that Westell common stock was traded on an active and efficient market and that plaintiff, relying on the defendants' materially false and misleading statements, and relying on the integrity of the market, purchased shares of Westell common stock at prices artificially inflated by defendants' misrepresentations. As such, had plaintiff known the truth, it would not have purchased the shares or would not have purchased them at the inflated prices. (Compl. ¶¶ 84-85.) With respect to the omissions of material fact prior to August 2, discussed above, plaintiff's allegations support the inference that they bought stock as a result of defendants' inflated public statements and not knowing the truth about SBC. These allegations adequately set out reliance and causation. *See Retsky*, 1998 WL 774678, at *12 (stating the allegations must support a fair inference that the defendant's actions caused the alleged loss and citing *Bastian* v. *Petren Resources Corp*, 892 F.2d 680, 684-85 (7th Cir. 1989)).

5.      *Liability Under § 20(a)*

Defendants move to dismiss Count II on the basis that it fails to state a claim upon which relief can be granted. Plaintiff does not respond to this argument; therefore, unless the court discerns that defendants' argument is obviously unfounded, it will not endeavor to make plaintiff's argument for it. Section 20(a) of the Securities Exchange Act of 1934[10] is remedial, to be construed liberally, and requires only some indirect

---

[10] Section 20(a) provides,

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any

means of discipline or influence short of actual direction to hold a control person liable. *Harrison* v. *Dean Witter Reynolds, Inc.*, 974 F.2d 873, 880 (7th Cir. 1992). To state a claim, a plaintiff must allege (a) a primary violation; (2) that the defendant exercised control over the operations of the primary violator; and (3) that the defendant possessed the power, whether or not exercised, to control the fraudulent activity. *See Lambert* v. *Calprotrack, Inc.*, No. 95 C 4076, 1996 WL 224515, at *1 (N.D. Ill. May 1, 1996). It appears that defendant Albelda, who is merely an employee of Westell, could not be liable under this section. Neither does the complaint make any allegations about Kirby and Reynolds, who are represented to be outside directors, that would permit an inference that they exercised control or had the power to control the actions of the top managers. Whether defendants Nelson, Zionts or Hindman can be considered control persons (with respect to Albelda or one another) has not been demonstrated either in the complaint or by response to this motion. For these reasons, the court will dismiss Count II.

---

person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 USCA s 78t.

## ORDER

For the reasons stated above, the motion to dismiss is denied with respect to Count I insofar as it alleges securities fraud regarding misrepresentations made before August 2, 2000 against Westell, Zionts and Hindman. The motion is granted in all respects in favor Nelson, Albelda, Kirby and Reynolds and granted as to Westell, Zionts and Hindman as to statements made after August 2, 2000. The motion is also granted with respect to Count II of the complaint.

Date: October 26, 2001

Enter: _Joan N. Lefkow_
JOAN HUMPHREY LEFKOW
United States District Judge