# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE WESTELL TECHNOLOGIES, INC. | ) | Civil Action No. 00 C 6735 |
| SECURITIES LITIGATION | ) | Judge Amy J. St. Eve |
| | ) | Magistrate Arlander Keys |
| | ) | |

**LEAD PLAINTIFF'S MEMORANDUM IN SUPPORT
OF MOTION FOR FINAL APPROVAL OF THE PROPOSED
SETTLEMENT, THE PLAN OF ALLOCATION OF SETTLEMENT
PROCEEDS, AND AN AWARD OF ATTORNEYS' FEES AND EXPENSES**

FILED

JUN 11 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

DOCKETED

JUN 12 2003

**BERNSTEIN LIEBHARD
& LIFSHITZ, LLP**
Stanley D. Bernstein, Esq.
Robert J. Berg, Esq.
10 East 40th Street, 22nd Floor
New York, New York 10016
(212) 779-1414

**Lead Counsel for the Class**

**MUCH SHELIST FREED
DENENBERG AMENT &
RUBENSTEIN, P.C.**

Carol V. Gilden
191 North Wacker Drive
Suite 1800
Chicago, Illinois 60606-1615
(312) 521-2000

**Liaison Counsel for the Class**



# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iv

INTRODUCTION ............................................................................... 1

STATEMENT OF FACTS .................................................................... 3

    A.    Background ............................................................................. 3

    B.    The Litigation ........................................................................ 4

    C.    The Settlement ....................................................................... 6

    D.    Due Notice Of The Pendency Of The Class Action And
           Of The Proposed Settlement Has Been Appropriately Given ............. 7

ARGUMENT ....................................................................................... 9

    I.    THE PROPOSED SETTLEMENT IS FAIR, REASONABLE,
        AND ADEQUATE, AND SHOULD BE APPROVED ...................... 9

        A.    Class Action Settlements Are Favored By The Courts ............. 9

        B.    The Role Of The Court In Approving The Proposed Settlement .............. 9

        C.    The Standards For Approval Of Class Action Settlements ................... 10

        D.    The Settlement Satisfies The Standards For
            Approval Of Class Action Settlements ................................... 11

            1.    The Strength Of Plaintiff's Case Measured
                Against the Settlement ............................................... 11

            2.    Complexity, Length and Expense ............................... 14

            3.    Degree of Opposition To The Settlement ..................... 16

            4.    The Presence Of Collusion In Gaining A Settlement ................. 17

            5.    The Opinion Of Competent Counsel ........................... 18

            6.    The Stage Of The Proceedings And
                The Amount Of Discovery Completed ......................... 19

II.     THE PLAN OF ALLOCATION IS FAIR AND
REASONABLE AND SHOULD BE APPROVED ............................................ 20

III.    NOTICE TO THE CLASS MEETS THE REQUIREMENTS
OF DUE PROCESS AND RULE 23 OF THE FEDERAL
RULES OF CIVIL PROCEDURE ...................................................... 22

IV.    THE COURT SHOULD CERTIFY THE CLASS
FOR PURPOSES OF THE FINAL SETTLEMENT ........................................... 23

      A.    The Requirements Of Federal Rule 23(a) Are Satisfied ......................... 24

           1.    Numerosity ....................................................................... 24

           2.    Commonality ..................................................................... 24

           3.    Typicality ......................................................................... 25

           4.    Lead Plaintiff Will Fairly And Adequately
Represent The Class ..................................................... 26

      B.    The Requirements Of Fed. R. Civ. P. 23(b)(3) Are Satisfied ................ 27

           1.    Common Questions Of Law And Fact Predominate
Over Individual Questions In This Litigation .............................. 27

           2.    A Class Action Is The Superior Method For
Adjudication Of The Claims Of The Class .................................. 28

V.     PLAINTIFF'S COUNSEL'S PETITION FOR AN AWARD OF FEES AND
REIMBURSEMENT OF EXPENSES SHOULD BE GRANTED ..................... 29

      A.    The Standards In The Seventh Circuit For Awarding
Class Counsel Fees ............................................................... 29

      B.    The Requested Fee Is Reasonable And Appropriate As
A Percentage Of The Common Fund ....................................... 31

           1.    The Proposed Fee Of One-Third Is Entirely Consistent
With Seventh Circuit Authority And Authority Nationwide ....... 31

           2.    The Proposed Fee Is Appropriate Because
Petitioners Faced A Substantial Risk of Non-Payment .............. 33

3.      The Proposed Fee Is Appropriate Because
Petitioners' Services Resulted In An Excellent
Settlement And Were Of High Quality ........................................ 35

4.      The Reaction Of The Class
Favors The Requested Award ...................................................... 36

C.      The Requested Fee Is Also Reasonable
Under A Lodestar Cross-Check ............................................................. 36

D.      Plaintiff's Counsel Are Entitled To Reimbursement Of Their
Reasonable Expenses Incurred In Prosecuting This Litigation ................ 39

CONCLUSION ............................................................................................................. 40

# TABLE OF AUTHORITIES

## CASES

Amchem Products v. Windsor,
    521 U.S. 591 (1997) ................................................................................................ 23

Anderson v. Torrington Co.,
    755 F. Supp. 834 (N.D. Ind. 1991) ........................................................................ 10

Armstrong v. Board of Sch. Directors,
    616 F.2d 305 (7th Cir. 1980),
    overruled on other grounds, Felzen v. Andreas,
    134 F.3d 873 (7th Cir. 1998) ........................................................... 9, 10, 11, 18

Bateman Eichler, Hill Richards, Inc. v. Berner,
    472 U.S. 299 (1985) ................................................................................................ 29

Beale v. EdgeMark Fin. Corp.,
    164 F.R.D. 649 (N.D. Ill. 1995) .............................................................................. 27

Binion v. Metropolitan Pier & Exposition Auth.,
    163 F.R.D. 517 (N.D.Ill. 1995) .............................................................................. 25

Boeing Co. v. Van Gemert,
    444 U.S. 472 (1980) ................................................................................................ 29

Broin v. Philip Morris,
    No. 91-49738, No. 91-49738 CA (Dade Cir. Ct. Feb. 6, 1998)
    aff'd sub nom. Ramos v. Philip Morris Cos.,
    743 So.2d 24 (Fla. Ct. App. 3d Dist. 1999) ................................................... 38-39

Burns v. Elrod,
    757 F.2d 151 (7th Cir. 1985) ................................................................................. 22

Cimarron Pipeline Const. Inc. v. National Council on Comp. Ins.,
    Nos. Civ. 89-822-T, 89-1186-T, 1993 WL 355466
    (W.D. Okla. June 8, 1993) ...................................................................................... 33

Class Plaintiffs v. City of Seattle,
    955 F.2d 1268 (9th Cir. 1992) ............................................................................... 20

Conley v. Sears, Roebuck & Co.,
    222 Bankr. 181 (D. Mass. 1998) ........................................................................... 39

Daubert v. Merrell Dow Pharm., Inc.
    509 U.S. 579 (1993) ....................................................................................... 13

De La Fuente v. Stokely-Van Camp, Inc.,
    713 F.2d 225 (7th Cir. 1983) ...................................................................... 25

Dolgow v. Anderson,
    43 F.R.D. 472 (E.D.N.Y. 1968),
    rev'd on other grounds, 438 F.2d 825 (2d Cir. 1970) ................................ 28-29

Donovan v. Estate of Fitzsimmons,
    778 F.2d 298 (7th Cir. 1985) ...................................................................... 9, 12

Eisen v. Carlisle & Jacquelin,
    417 U.S. 156 (1974) .................................................................................... 8, 23

Elkins v. Equitable Life Ins. Co. of Iowa,
    No. Civ A-96-296-Civ-T-17B, 1998 WL 133741
    (M.D. Fla. Jan. 28, 1998) .......................................................................... 39

First Interstate Bank of Nevada, N.A. v. National Republic Bank of Chicago,
    No. 80 C 6401 (N.D. Ill. Feb. 12, 1988) .................................................. 32

Florin v. Nationsbank of Georgia, N.A.,
    34 F.3d 560 (7th Cir. 1994) ......................................................... 29, 30, 33, 38

Florin v. Nationsbank of Georgia, N.A.,
    60 F.3d 1245 (7th Cir. 1995) ...................................................................... 34, 38

Follansbee v. Discover Fin. Servs.,
    No. 99 C 3827, 2000 WL 804690
    (N.D. Ill. June 21, 2000) .......................................................................... 10-11, 14

Gaskill v. Gordon,
    942 F. Supp. 382 (N.D. Ill. 1996)
    aff'd, 160 F.3d 361(7th Cir. 1998) ........................................................... 31

Gaskill v. Gordon,
    160 F.3d 361 (7th Cir. 1998) ..................................................................... 32, 38

General Elec. Capital Corp. v. Lease Resolution Corp.,
    128 F.3d 1074 (7th Cir. 1997) ................................................................... 11

Gilbert v. First Alert, Inc.,
    No. 94 C 6760, 1998 WL 142406
    (N.D. Ill. Mar. 24, 1998) ................................................................................................ 16

Goldsmith v. Tech. Solutions Co.,
    No. 92 C 4374, 1995 WL 17009594
    (N.D. Ill. June 21, 200) ................................................................................................. 32

Great Neck Capital Appreciation Inv. P'ship v. PricewaterhouseCoopers, L.L.P.,
    212 F.R.D. 400 (E.D. Wis. 2002) .......................................................................... *passim*

In re Airline Ticket Comm'n Antitrust Litig.,
    953 F. Supp. 280 (D. Minn. 1997) ............................................................................... 33

In re Art Materials Antitrust Litig.,
    MDL Docket No. 436, 1983 WL1947
    (N.D. Ohio Dec. 27, 1983) ........................................................................................... 36

In re Brand Name Prescription Drugs,
    No 94 C 897, 2000 WL 204112
    (N.D. Ill. Feb. 10, 2000) ......................................................................................... 37, 38

In re Caremark Intern. Sec. Litig.,
    No. 94 C 4751 (N.D. Ill. Dec. 15, 1997) .................................................................... 32

In re Continental Ill. Sec. Litig.,
    962 F.2d 566 (7th Cir. 1992) ................................................................... 30, 31, 37, 38

In re Crazy Eddie Sec. Litig.,
    824 F. Supp. 320 (E.D.N.Y. 1993) ............................................................................. 33

In re Equity Funding Corp. of Am. Sec. Litig.,
    438 F. Supp. 1303 (C.D. Cal. 1977) ........................................................................... 35

In re First Merchants Acceptance Corp. Sec. Litig.,
    No. 97 C 2415 (N.D. Ill. Apr. 21, 2000) .................................................................... 32

In re General Public Utils. Sec. Litig.,
    No. 79-1420, 1983 WL 22362
    (D.N.J. Nov. 16, 1983) ................................................................................................ 36

In re GMC Pick-Up Truck Fuel Tank Prod. Liab. Litig.,
    55 F.3d 768 (3d Cir. 1995) .......................................................................................... 36

In re Greenwich Pharm. Sec. Litig.,
    Civ. A. No. 92-3071, 1995 WL 251293
    (E.D. Pa. Apr. 26, 1995) ................................................................................. 13

In re Gulf/Oil Cities Serv. Tender Offer Litig.,
    142 F.R.D. 588 (S.D.N.Y. 1992) .............................................................. 34, 36

In re Ikon Office Solutions, Inc. Sec. Litig.,
    194 F.R.D. 166 (E.D.Pa. 2000) ........................................................ 34, 35, 39

In re Lithotripsy Antritrust Litig.,
    No. 98 C 8394, 2000 WL 765086
    (N.D. Ill. June 12, 2000) ....................................................................... 16, 19

In re Lloyd's American Trust Fund Litig.,
    No. 96 Civ. 1262, 2002 WL 31663577
    (S.D.N.Y. Nov. 26, 2002) ......................................................................... 20

In re Medical X-Ray Film Antitrust Litig.,
    No. CV-93-5904, 1998 WL 661515
    (E.D.N.Y. Aug. 7, 1998) ............................................................................ 33

In re Mexico Money Transfer Litig.,
    164 F. Supp. 2d 1002 (N.D.Ill. 2000),
    aff'd, 267 F.3d 743 (7th Cir. 2001),
    cert. denied sub nom. Garcia v. Western Union Fin. Servs., Inc.,
    535 U.S. 1018 (2002) .................................................................... *passim*

In re Nanophase Tech. Corp. Sec. Litig.,
    No. 99 C 3450 (N.D. Ill. Mar. 24, 2001) ........................................................ 32

In re NASDAQ Market-Maker Antitrust Litig.,
    187 F.R.D. 465 (S.D.N.Y.1998) ................................................................. 38

In re National Student Marketing Litig.,
    68 F.R.D. 151 (D.D.C. 1974) ..................................................................... 15

In re Nuveen Fund Litig.,
    No. 94 C 360 (N.D. Ill. June 3, 1997) ........................................................... 32

In re Oracle Sec. Litig.,
    No. C-90-0931-VRW, 1994 WL 502054
    (N.D. Cal. June 18, 1994) .......................................................................... 20

In re Prudential Ins. Co.,
148 F.3d 283 (3d Cir. 1998) ..................................................................... 38

In re Prudential Ins. Co. of America Sales Practices Litig.,
106 F. Supp. 2d 721 (D.N.J. 2000) ........................................................... 38

In re Prudential Sec. Inc. Ltd. P'hip Litig.,
912 F. Supp. 97 (S.D.N.Y. 1996) .............................................................. 35

In re Public Serv. Co. of New Mexico,
No. 91-0536M, 1992 WL 278452
(S.D. Cal. July 29, 1992) ........................................................................... 33

In re Sears Retiree Group Life Ins. Litig.,
No. 97 C 7453, 2002 WL 475180
(N.D. Ill. Mar. 27, 2002) ........................................................................... 31

In re Shell Oil Refinery,
155 F.R.D. 552 (E.D. La. 1993) ................................................................ 39

In re SmithKline Beckman Corp. Sec. Litig.,
751 F. Supp. 525 (E.D. Pa. 1990) ....................................................... 36, 39

In re Southern Ohio Correctional Facility,
173 F.R.D. 205 (S.D. Ohio 1997) ............................................................. 18

In re Soybean Futures Litig.,
No. 89 C 7009 (N.D. Ill. Nov. 27, 1996) ................................................. 32

In re Spyglass Inc. Sec. Litig.,
No. 99 C 0512 (N.D. Ill. May 23, 2000) ................................................... 32

In re Sumitomo Copper Litig.,
74 F. Supp. 2d 393 (S.D.N.Y. 1999) ........................................................ 39

In re Synthroid Marketing Litig.,
264 F.3d 712 (7th Cir. 2001) ............................................................... 30, 33

In re Synthroid Marketing Litig.,
325 F.3d 974 (7th Cir. 2003) ............................................................... 30, 34

In re Warner Communications Sec. Litig.,
618 F. Supp. 735 (S.D.N.Y.1985)
aff'd, 798 F. 2d 35 (2d Cir. 1986) ....................................................... 14, 35

In re Washington Public Power Supply Sys. Sec. Litig.,
      19 F.3d 1291 (9th Cir. 1994)
      aff'd in part sub nom. Class Plaintiffs v. Jaffe & Schlesinger, P.A.,
      19 F.3d 1306 (9th Cir. 1994) ................................................................ 37

In re Waste Mgmt., Inc. Sec. Litig.,
      128 F. Supp. 2d 401 (S.D.Tex. 2000) ...................................................... 31

In re Wedtech Sec. Litig.,
      MDL 735 (S.D.N.Y. July 31, 1992) ......................................................... 33

Isby v. Bayh,
      75 F.3d 1191 (7th Cir. 1996) ........................................................... *passim*

J.I. Case Co. v. Borak,
      377 U.S. 426 (1964) ............................................................................. 29

Joel A. v. Giuliani,
      218 F.3d 132 (2d Cir. 2000) .................................................................... 9

Kaufman v. Motorola, Inc.,
      No. 95 C 1069, 2000 WL 1506892
      (N.D. Ill. Sept. 21, 2000) ....................................................................... 13

Kaufman v. Motorola, Inc.,
      No. 95-CV-1069 (N.D. Ill. May 24, 2001) .............................................. 32

King v. Kansas City Southern Indus., Inc.,
      519 F.2d 20 (7th Cir.1975) .................................................................... 23

Kuhnlein v. Department of Revenue,
      662 So. 2d 309 (Fla. 1995) ..................................................................... 39

Kurzweil v. Philip Morris Co.,
      Nos. 94 Civ. 2373, 94 Civ. 2546, 1999 WL 1076105
      (S.D.N.Y. Nov. 30, 1999) ...................................................................... 39

Levitan v. McCoy,
      No. 00C5096, 2003 WL 1720047
      (N.D. Ill. Mar. 31, 2003) ................................................................ *passim*

Liddell v. Board of Educ. Of City of St. Louis,
      No. 4:72CV100 SNL, 1999 WL 33314210
      (E.D. Mo. Mar. 12, 1999) ...................................................................... 17

Liebhard v. Square D Co.,
  No. 91 C 1103 (N.D. Ill. June 6, 1993) ........................................................ 32

Mangone v. First USA Bank,
  206 F.R.D. 222 (S.D. Ill. 2001) ................................................................... 23

Mashburn v. National Healthcare, Inc.,
  684 F. Supp. 679 (M.D. Ala. 1988) ............................................................. 36

Michels v. Phoenix Home Life Mut. Ins. Co.,
  No. 95/5318, 1997 WL 1161145
  (N.Y. Sup. Ct. Albany Co. Jan. 3, 1997) ...................................................... 39

Mills v. Electric Automobile-Lite Co.,
  396 U.S. 375 (1970) .................................................................................... 29

Miltland Raleigh-Durham v. Myers,
  840 F. Supp. 235 (S.D.N.Y. 1993) ............................................................... 39

Mullane v. Central Hanover Bank & Trust Co.,
  339 U.S. 306 (1950) ...................................................................................... 8

Pavlidis v. New England Patriots Football Club, Inc.,
  675 F. Supp. 707 (D. Mass. 1987) ............................................................... 36

Rabin v. Concord,
  No. 89 Civ. 6130, 1991 WL 275757
  (S.D.N.Y. Dec. 19, 1991) ............................................................................ 39

Ressler v. Jacobson,
  149 F.R.D. 651 (M.D. Fla. 1992) ................................................................. 36

Retsky Family Ltd. P'ship v. Price Waterhouse LLP,
  No. 97 C7694, 2001 WL 1568856
  (N.D. Ill. Dec. 10, 2001) ..................................................................... passim

Reynolds v. Beneficial Nat'l Bank,
  288 F.3d 277 (7th Cir. 2002) ........................................................................ 9

Reynolds v. National Football League,
  584 F.2d 280 (8th Cir. 1978) ...................................................................... 22

Rosario v. Livaditis,
  963 F.2d 1013 (7th Cir. 1992) .................................................................... 24

x

Scholes v. Moore,
    150 F.R.D. 133 (N.D. Ill. 1993) ............................................................................ 27

Scholes v. Stone, McGuire & Benjamin,
    143 F.R.D. 181 (N.D. Ill. 1992) ............................................................................ 25

Shaw v. Toshiba Amer. Information Sys. Inc.,
    91 F. Supp. 2d 942 (E.D. Tex. 2000) ................................................................... 40

Skelton v. General Motors Corp.,
    860 F.2d 250 (7th Cir. 1988) ...................................................................... 34, 37, 38

Slomovics v. All For A Dollar, Inc.,
    906 F. Supp. 146 (E.D.N.Y. 1995) ....................................................................... 36

Spicer v. Chicago Board Options Exchange, Inc.,
    844 F. Supp. 1226 (N.D. Ill. 1993) ...................................................................... 39

Trustees v. Greenough,
    105 U.S. 527 (1881) ............................................................................................. 29

Uhl v. Thoroughbred Tech. and Telecomms., Inc.,
    309 F.3d 978 (7th Cir. 2002) ............................................................................ 9, 27

United States Football League v. National Football League,
    887 F.2d 408 (2d Cir. 1989) ................................................................................. 37

Vaughns v. Board of Educ. Of Prince George's County,
    18 F. Supp. 2d 569 (D. Md. 1998) .................................................................. 17-18

Waters v. International Precious Metals Corp.,
    190 F.3d 1291 (11th Cir.1999) ............................................................................. 33

Weiner v. Quaker Oats Co.,
    No. 98 C 3123 (N.D. Ill. Sept. 14, 2001) ............................................................ 32

Weiss v. Drew Nat'l Corp.,
    465 F. Supp. 548 (S.D.N.Y. 1979) ...................................................................... 36

Williams v. First National Bank,
    216 U.S. 582 (1910) ............................................................................................... 9

Willson v. New York Life Ins. Co.,
    No. 94/127804, 1995 N.Y. Misc. LEXIS 652
    (Sup. Ct. N.Y. County Nov. 8, 1995)
    aff'd without opinion, 228 A.D.2d 368 (1st Dep't 1996) ................................................ 39

Ziemack v. Centel Corp.,
    163 F.R.D. 530 (N.D. Ill. 1995) .................................................................................... 27

## STATUTES & OTHER AUTHORITIES

Securities Exchange Act of 1934

    15 U.S.C.§ 78j(b) ......................................................................................................... 4
    15 U.S.C. § 78t ............................................................................................................. 4
    15 U.S.C. § 78u-4(a)(6) .............................................................................................. 31

Federal Rules of Civil Procedure

    Fed. R. Civ. P. 23(a) ................................................................................................. 29
    Fed. R. Civ. P. 23(a)(1) ............................................................................................. 24
    Fed. R. Civ. P. 23(a)(2) ............................................................................................. 24
    Fed. R. Civ. P. 23(a)(3) ............................................................................................. 25
    Fed. R. Civ. P. 23(a)(4) ............................................................................................. 26
    Fed. R. Civ. P. 23(b)(3) ................................................................................... 27, 28, 29
    Fed. R. Civ. P. 23(e) ............................................................................................... 9, 10

17 C.F.R. 240.10b-5 ................................................................................................................ 4

1 Newberg on Class Actions § 3.10 (3d ed. 1992) ...................................................... 24

2 Newberg on Class Actions § 8.02 (3d ed.1992) ...................................................... 22

2 Newberg on Class Actions § 8.04 (3d ed. 1992) ...................................................... 22

3 Newberg on Class Actions § 14.03 (3d ed. 1992) ...................................................... 38

Manual for Complex Litig., Second ¶ 30.211 (2d ed.1985) ........................................ 22

**INTRODUCTION**

Lead Plaintiff Fuller & Thaler Asset Management, Inc. ("Lead Plaintiff") submits this memorandum of law in support of (i) the proposed settlement (the "Settlement") of this consolidated class action (the "Action" or the "Litigation"), as set forth in the Stipulation of Settlement executed by the parties as of March 3, 2003 (the "Stipulation"), (ii) the plan of allocation of settlement proceeds (the "Plan of Allocation"), and (iii) an application for an award of attorneys' fees and reimbursement of expenses. Lead Plaintiff brought this action on behalf of all individuals and entities ("Class Members" or the "Class") that purchased the common stock of Westell Technologies, Inc. ("Westell" or the "Company") from June 27, 2000 through October 18, 2000 (the "Class Period").

Through their vigorous efforts, lead counsel for the Class ("Lead Counsel") have achieved a settlement that is an excellent result for the Class. The Settlement provides for a fund of $3.35 million in cash, plus interest earned thereon (the "Settlement Fund"), for the benefit of the Class. As required by this Court's Order of March 31, 2003 (the "Preliminary Approval Order"), Lead Counsel caused the Notice of Pendency and Proposed Settlement of Class Action and Proposed Hearing (the "Notice"), describing the terms of the Settlement, the Plan of Allocation, and Lead Counsel's application for an award of attorneys' fees and reimbursement of expenses, to be provided to the Class. Although the Notice informed the Class that any objections to the Settlement or fee and expense request had to be served upon counsel and the Clerk of the Court by June 4, 2003, this deadline has passed with no objections being submitted, confirming the excellence of the result.

Lead Counsel request attorneys' fees of thirty-three and one-third percent of the Settlement Fund, plus reimbursement of the expenses that were advanced in connection with the Action (in an amount the parties agreed would not exceed $150,000 plus interest). As explained

below, the requested one-third fee, amounting to $1,116,667, is fair and reasonable not only by reference to percentage fee awards in comparable cases, but also under an analysis of the particular circumstances of this case, including the vigorous and extensive efforts of Lead Counsel and the substantial cash recovery achieved for the Class. In addition, such an award compares favorably with the "lodestar" value of the time expended by Plaintiff's Counsel to date. Under the lodestar/multiplier analysis, the requested fee represents a modest multiplier of approximately 1.48, well within the range frequently awarded in similar cases. The absence of objections from Class Members to the fee application demonstrates that the requested fee is fair and reasonable in light of the work done and the result achieved.

The proposed Settlement is the result of hard-fought litigation and was reached only after extensive and vigorous arm's-length negotiations by highly experienced counsel on both sides. Negotiations took place after Lead Counsel had conducted an extensive investigation into the facts and law supporting the Class Members' claims, after substantial discovery had taken place, after every legal challenge asserted by defendants had been addressed, and after a thorough analysis by experts retained by Lead Counsel.

Lead Plaintiff respectfully refers the Court to the accompanying Declaration of Robert J. Berg (the "Berg Declaration") for a detailed description of the Action, including a complete history of the proceedings, the activities of Plaintiff's Counsel, and the factors bearing on the reasonableness of the Settlement. For all of the reasons set forth herein and in the Berg Declaration, Lead Plaintiff respectfully requests that the Court approve the Settlement and Plan of Allocation as fair, reasonable, and adequate, and approve the award of attorneys' fees and reimbursement of expenses requested herein.

## STATEMENT OF FACTS

### A.    Background

Through its operating companies, Westell manufactured and sold digital and analog

products used by telephone companies to deliver services between end users and a telephone

company's central office. During the Class Period, a major portion of Westell's revenues were

derived from its supply of DSL modems to three large telecommunications companies: SBC

Communications Inc. ("SBC"), Verizon Communications, and British Telecommunications plc

("British Telecom").

During the Class Period, defendants reassured Wall Street and the investing public

(through press releases and conversations with analysts) that the Company's forecasts for sales of

DSL modems were on track and would meet Wall Street's expectations for the second quarter of

fiscal year 2001, ending September 30, 2000. Lead Plaintiff alleges that defendants knew at the

time they made these statements Westell was experiencing a substantial shortfall in second-

quarter sales due to decreased orders from its largest customer, SBC, which was experiencing a

dramatic slowdown in DSL installations. Lead Plaintiff also alleges that SBC had built up a

massive inventory of more than 200,000 Westell modems, sitting in SBC's warehouse, and that

defendants knew that SBC would be purchasing far fewer Westell modems during the second

quarter of Westell's fiscal year 2000. Because of SBC's decreased purchase orders, Westell's

modem sales for the second quarter of fiscal 2001 would be more than $20 million less than the

$65-70 million being communicated to the investing public by Westell's senior management.

On August 2, 2000, an analyst publicly disclosed a decline in Westell's modem sales,

leading to a 14% drop in Westell's share price by the following day's close. On October 18,

2000, after trading had ended for the day, the Company admitted that SBC's slowdown on orders

-3-

had had an exceedingly negative effect on its revenues for the second fiscal quarter of 2001. After closing at $9 per share on October 18, Westell stock tumbled 34% in value to a close of $5.94 per share on October 19.

**B.      The Litigation**

After Westell's announcement on October 18, 2000, eleven securities class actions were filed against Westell and certain Westell officers and directors in this Court. By order of the Court dated January 11, 2001, these class actions were consolidated, Fuller & Thaler Asset Management, Inc. was appointed Lead Plaintiff for the consolidated securities class action, and the law firm of Bernstein Liebhard & Lifshitz, LLP was appointed Lead Counsel.

On February 1, 2001, Lead Plaintiff filed a Consolidated Amended Class Action Complaint (the "Complaint"). Lead Plaintiff sued both on its own behalf and on behalf of all purchasers of Westell common stock between the dates of June 27, 2000 and October 18, 2000. Lead Plaintiff alleged that the defendants had made public misrepresentations and had omitted to state material facts concerning Westell's anticipated revenues for the second quarter of fiscal year 2001, and thereby violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t, and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission, 17 C.F.R. 240.10b-5.

The defendants then filed a motion to dismiss the Complaint. All discovery was stayed automatically pending resolution of the motion to dismiss pursuant to the provisions of the Private Securities Litigation Reform Act. On October 26, 2001, the Court granted the motion to dismiss in part and denied it in part. The Court dismissed Count II of the Complaint (violation of § 20(a) of the Securities Exchange Act of 1934) as to all the defendants. The Court dismissed Count I (violation of § 10(b) of the Securities Exchange Act of 1934) as to defendants Nelson,

-4-

Albelda, Kirby, and Reynolds. The Court dismissed Count I in part as to defendants Westell, Zionts and Hindman. Significantly, the Court held that defendants could not be liable for any statements or omissions made after August 2, 2000, when an analyst publicly disclosed a decline in Westell's modem sales. Thus, the Court eliminated the possibility of recovery for all Class Members who purchased Westell shares between August 3, 2000 and October 18, 2000 (absent appellate review or this Settlement).

As a result of the Court's ruling, the stay of discovery was lifted. Defendants Westell, Zionts, and Hindman answered the Complaint and complied with the mandatory disclosure requirements of Rule 26(a)(1) of the Federal Rules of Civil Procedure on November 30, 2001. The parties then engaged in discovery, and defendants produced thousands of pages of relevant documents. Lead Plaintiff also obtained thousands of pages of relevant documents from third parties, including SBC and securities analysts who followed Westell (some of whom Lead Counsel also interviewed). In particular, documents produced by defendants and SBC created at least material and hotly contested issues as to whether defendants knew of a slowdown of sales of modems to SBC, and whether certain defendants sold substantial holdings of the Westell stock based on non-public information. Thereafter, the parties conducted settlement negotiations.

After extended settlement discussions reached an impasse, the parties appeared before Magistrate Judge Keys on September 18, 2002 to mediate their dispute. After a full day of contentious negotiations under the guidance of Magistrate Judge Keys, the parties reached an oral agreement on the principal terms of a settlement. The final Stipulation of Settlement was executed as of March 3, 2003.

C.    **The Settlement**

The Settlement consists of $3.35 million in cash, plus interest. As fully described in the

Notice, the Settlement Fund, less attorneys' fees, taxes and other expenses as may be allowed by

the Court, will be distributed among the Class Members pursuant to the Plan of Allocation, based

on each Member's recognized loss. The Settlement divides the Class Period into two separate

periods: June 27, 2000 through August 2, 2000, and August 3, 2000 through October 18, 2000.

Ninety percent of the Net Settlement Fund is to be paid to Class Members who acquired their

shares during the earlier period, and ten percent is to be paid to Class Members who acquired

their shares during the later period. The rationale for this allocation is that Class Members in the

later period – August 3, 2000 through October 18, 2000 – have had their claims dismissed with

prejudice by the Court, establishing the weakness of their claims (absent an appellate decision

overturning the Court's decision on the motion to dismiss). Yet the Plan of Allocation

recognizes that Class Members in the later period will be providing a release to defendants and

are entitled to compensation for that release.

Within each time period (June 27 through August 2, 2000, and August 3 through October

18, 2000), each authorized claimant will be paid the percentage of the Net Settlement Fund that

the claimant's claim bears to the total of the claims of all authorized claimants who purchased

during that period.

This Settlement represents the culmination of two and one-half years of intensive

litigation, conducted by counsel well-experienced in the field of securities litigation. Throughout

the Litigation, both before and after the Court granted in part and denied in part defendants'

motion to dismiss, defendants maintained that the Class claims lacked merit. The Class and its

Counsel are fully aware that the Court dismissed the Complaint with prejudice as to certain

-6-

defendants, as well as all claims under Section 20(a) of the Exchange Act, and the Section 10(b)

claims of Class Members who acquired their stock after August 2, 2000. Moreover, even as to

the Section 10(b) claims that survived (for the period June 27, 2000 through August 2, 2000),

there is certainly some risk that the Class would not prevail at trial or on appeal of any or all of

its claims, or that the decline in the price of Westell common stock might be attributed, in whole

or in part, to factors other than defendants' alleged misrepresentations and omissions. As a

result, it is possible that, absent settlement, the Class might recover nothing, or substantially less

than the $3.35 million Settlement Fund, plus accrued interest. Thus, the Class and its Counsel

have concluded that the proposed Settlement is fair, reasonable, and adequate, confers substantial

benefits upon the Class, is in the Class's best interests, and merits this Court's approval.

### D. Due Notice Of The Pendency Of The Class Action And Of The Proposed Settlement Has Been Appropriately Given

On March 31, 2003, the Court entered the Preliminary Approval Order preliminarily

approving the Settlement and directing that a hearing be held on June 18, 2003 to determine the

fairness, reasonableness, and adequacy of the proposed Settlement, and conditionally certifying

the Class for purposes of settlement. Pursuant to the Preliminary Approval Order, the Notice, in

the form approved by the Court, was mailed to Class Members beginning on April 30, 2003. See

Affidavit of Brian Burke, sworn to on June 6, 2003 and submitted herewith (the "Burke Aff."), at

¶ 3. The Claims Administrator has mailed 24,190 Notices to potential Class Members. Burke

Aff. ¶ 7. In addition, a Summary Notice of Pendency and Proposed Settlement of Class Action

(the "Summary Notice"), in the form approved by the Court, was published in Investor's

Business Daily on May 9, 2003. Burke Aff. at ¶ 6.

The Notice contained a description of the nature and procedural history of the Action and

the terms of the proposed Settlement, including the amount of the Settlement Fund, the manner

in which the Settlement Fund is to be allocated among Class Members, and the claims that would be released in the Settlement. The Notice also advised Class Members of their right to opt out of the Class or object to the Settlement no later than June 4, 2003, of the amount to be requested for attorneys' fees, and of the maximum amount to be requested for reimbursement of expenses.

The form of notice used in this case was "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." <u>Mullane v. Central Hanover Bank & Trust Co.</u>, 339 U.S. 306, 314 (1950). The mailing to identifiable Class Members of the Notice by first-class mail and publication of the Summary Notice in a well-known national newspaper was the best practicable means to notify Class Members, and readily satisfies Rule 23. <u>Eisen v. Carlisle & Jacquelin</u>, 417 U.S. 156, 173 (1974).

The deadline for Class Members to opt out or to file objections has expired. No Class Member has objected to the Settlement and only two have elected to opt out of the Settlement – representing only 300 shares in total. The absence of any objections is compelling evidence that the Class considers the Settlement to be fair, reasonable, and adequate. <u>See, e.g.</u>, <u>Retsky Family Ltd. P'ship v. Price Waterhouse LLP</u>, No. 97 C7694, 2001 WL 1568856, at *3 (N.D. Ill. Dec. 10, 2001); <u>Great Neck Capital Appreciation Inv. P'ship v. PricewaterhouseCoopers, L.L.P.</u>, 212 F.R.D. 400, 410 (E.D. Wis. 2002) ("A favorable reception by the class is evidence of the fairness of a proposed settlement.").

**ARGUMENT**

I.  **THE PROPOSED SETTLEMENT IS FAIR, REASONABLE,
    AND ADEQUATE, AND SHOULD BE APPROVED**

   A.  **Class Action Settlements Are Favored By The Courts**

   It is well settled that "[c]ompromises of disputed claims are favored by the courts."

Williams v. First Nat'l Bank, 216 U.S. 582, 595 (1910).  See also Uhl v. Thoroughbred

Technology and Telecommunications, Inc., 309 F.3d 978, 986 (7th Cir. 2002); Donovan v. Estate

of Fitzsimmons, 778 F.2d 298, 307 (7th Cir. 1985).  Class actions readily lend themselves to

compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical

length of the litigation:

> In the class action context in particular, "there is an overriding public interest in
> favor of settlement."  Cotton v. Hinton, 559 F.2d 1326, 1331 (5th Cir. 1977).
> Settlement of the complex disputes often involved in class actions minimizes the
> litigation expenses of both parties and also reduces the strain such litigation
> imposes upon already scarce judicial resources.

Armstrong v. Board of Sch. Dirs., 616 F.2d 305, 313 (7th Cir. 1980), overruled on other grounds,

Felzen v. Andreas, 134 F.3d 873 (7th Cir. 1998).  See also Isby v. Bayh, 75 F.3d 1191, 1196 (7th

Cir. 1996) ("Federal courts naturally favor the settlement of class action litigation."); Great Neck

Capital, 212 F.R.D. at 409 ("the settlement of class action litigation is favored") (citing Isby).

   B.  **The Role Of The Court In
       Approving The Proposed Settlement**

   "'Federal Rule of Civil Procedure 23(e) requires court approval of any settlement that

effects the dismissal of a class action.  Before such a settlement may be approved, the district

court must determine that a class action settlement is fair, adequate, and reasonable, and not a

product of collusion.'"  Reynolds v. Beneficial Nat'l Bank, 288 F.3d 277, 279 (7th Cir. 2002)

(quoting Joel A. v. Giuliani, 218 F.3d 132, 138 (2d Cir. 2000)).  "Courts are not," however, "to

substitute their own judgment as to optimal settlement terms for the judgment of the litigants and

their counsel." Great Neck Capital, 212 F.R.D. at 409. As the Seventh Circuit has written:

> Because settlement of a class action, like settlement of any litigation, is basically a
> bargained exchange between the litigants, the judiciary's role is properly limited
> to the minimum necessary to protect the interests of the class and the public.
> Judges should not substitute their own judgment as to optimal settlement terms for
> the judgment of the litigants and their counsel.

Armstrong, 616 F.2d at 315 (emphasis added). "A strong presumption of fairness attaches to a

settlement agreement when it is the result of this type of [arm's-length] negotiation." Great Neck

Capital, 212 F.R.D. at 410 (citing Anderson v. Torrington Co., 755 F. Supp. 834, 838 (N.D. Ind.

1991)) (settlement reached after two-day mediation).

As discussed above, the Settlement here was negotiated at arm's length between Lead

Counsel and counsel for defendants over many months, culminating in a one-day mediation

before Magistrate Judge Keys on September 18, 2002. Moreover, the attorneys who conducted

the negotiations for the Class are among the most highly regarded in the country, have many

years of experience in conducting complex securities litigation, and were thoroughly conversant

with the strengths and weaknesses of the case. Counsel's decision, therefore, should be given

great deference. Armstrong, 616 F.2d at 315.

### C. The Standards For Approval Of Class Action Settlements

Pursuant to Rule 23(e), the Court should approve a class settlement if it is fair, adequate,

and reasonable, and in the best interests of the Class. Isby, 75 F.3d at 1196; Retsky Family Ltd.

P'ship, 2001 WL 1568856, at *2; In re Mexico Money Transfer Litig., 164 F. Supp. 2d 1002,

1014 (N.D. Ill. 2000), aff'd, 267 F.3d 743 (7th Cir. 2001), cert. denied sub nom. Garcia v.

Western Union Fin. Servs., Inc., 535 U.S. 1018 (2002); Follansbee v. Discover Fin. Servs., No.

-10-

99 C 3827, 2000 WL 804690, at *5 (N.D. Ill. June 21, 2000). The Seventh Circuit requires

courts making this determination to consider the following factors:

> 1) the strength of the plaintiff's case on the merits measured against the terms of
> the settlement; 2) the complexity, length, and expense of continued litigation;
> 3) the amount of opposition to the settlement among affected parties; 4) the
> presence of collusion in gaining a settlement; 5) the stage of the proceedings; and
> 6) the amount of discovery completed.

General Elec. Capital Corp. v. Lease Resolution Corp., 128 F.3d 1074, 1082 (7th Cir. 1997). See

also In re Mexico Money Transfer Litig., 164 F. Supp. 2d at 1014. Courts should not "'focus on

individual components of the settlements, but rather view them in their entirety in evaluating the

fairness.'" Isby, 75 F.3d at 1199 (quoting Armstrong, 616 F.2d at 315). They must also

"consider the facts 'in the light most favorable to the settlement.'" Id.

When examined under the applicable criteria, this Settlement is an outstanding result for

the Class. Lead Counsel believe that there are serious questions as to whether a more favorable

monetary result against defendants could or would be attained after trial and the inevitable post-

trial motions and appeals. The Settlement achieves a prompt and substantial recovery for Class

Members and is unquestionably superior to the distinct possibility that, were this Action to

proceed to trial, there might be no recovery at all. Analysis of the relevant factors demonstrates

that the proposed Settlement merits this Court's approval.

> **D.      The Settlement Satisfies The Standards For
> Approval Of Class Action Settlements**

> **1.      The Strength Of Plaintiff's Case Measured Against the Settlement**

First among the factors cited by the Seventh Circuit to assess the fairness of a class action

settlement is the strength of the plaintiff's case measured against the recovery provided in the

settlement. Isby, 75 F.3d at 1198; Armstrong, 616 F. 2d at 314; In re Mexico Money Transfer

Litig., 164 F. Supp. 2d at 1014. Courts have cautioned, however, against unnecessarily engaging

-11-

in detailed fact finding, or conducting a proceeding akin to a trial on the merits. See, e.g., Retsky
Family Ltd. P'ship, 2001 WL 1568856, at *1. Moreover, consideration of this factor must take
into account that "[s]hareholder class actions are difficult and unpredictable." Great Neck
Capital, 212 F.R.D. at 409.

The Court found that Class Members who purchased Westell shares during the period
August 3, 2000 through October 18, 2000 had no actionable securities fraud claim against the
defendants because an analyst publicly disclosed a slowdown of modem sales to SBC on August
2, 2000. Although those Class Members' claims were, therefore, extremely weak, the Settlement
nonetheless allocates ten percent of the Settlement Fund to them in exchange for their release of
defendants.

Class Members who purchased Westell shares from June 27, 2000 to August 2, 2000
have substantially stronger claims that the Court upheld, focusing on defendants' creation of
unjustifiable expectations about the Company's prospects. Moreover, several corporate insiders
sold large amounts of stock during this time period, strengthening Lead Plaintiff's allegations of
scienter. Even those claims, however, are not free of doubt. Absent this Settlement, defendants
would argue that they made no false statements, that they did not see any slowdown in orders,
and that they met their sales expectations for SBC by the end of the quarter. With respect to their
insider trades, defendants would likely claim that their sales were pre-planned for diversification
purposes and were not unusual in size or timing.

Indeed, although the Court found several of defendants' statements before August 2, 2000
to be actionable at the motion to dismiss stage, a substantial risk remains that the Class would be
unable to prove its claims at the summary judgment stage or at trial. Donovan, 778 F. 2d at 308;
In re Mexico Money Transfer Litig., 164 F. Supp. 2d at 1014. In balancing these risks against the

-12-

Settlement, the Court should consider the immediacy and certainty of a substantial recovery against the risks of continued litigation. <u>Retsky Family Ltd. P'ship</u>, 2001 WL 1568856, at *2 ("The settlement provides certainty of recovery that was not available with litigation.").

Similarly, Lead Plaintiff would have substantial difficulty in establishing that the defendants acted with the requisite state of mind, as the Court indicated in its Order dated October 26, 2001. To prove scienter, the Class must prove that defendants intentionally or recklessly deceived the investing public about Westell's financial results during the Class Period. Specifically, the Class has alleged that SBC was the centerpiece of Westell's prosperity, and that Westell's top managers knew that sales to SBC would drop precipitously. Although the Court found that the Complaint sufficiently alleged scienter as to three of the Individual Defendants – that a strong inference could be drawn that these insiders had information they used to their own benefit before the information became public – going forward the Class would actually have to prove those allegations. <u>See</u> <u>In re Greenwich Pharm. Sec. Litig.</u>, Civ. A. No. 92-3071, 1995 WL 251293, at *4 (E.D. Pa. Apr. 26, 1995) ("[I]t is impossible to predict how the jury would react . . . . This unpredictability is avoided by the proposed Settlement, which provides the class with a meaningful percentage of the recovery that might realistically be obtained through trial.").

Defendants have also asserted (and the Class has disputed) that the Class would have difficulty proving loss causation and damages. Although Lead Plaintiff estimates the Class's damages to be in the range of $20 million (based upon an optimistic damages model that has been subject to serious attack under <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993)),[1] Lead Plaintiff's damage expert cannot conclusively attribute those damages to

---

[1] <u>See, e.g.</u>, <u>Kaufman v. Motorola, Inc.</u>, No. 95 C 1069, 2000 WL 1506892, at *2 (N.D. Ill. Sept. 21, 2000) (proportional trading model to determine aggregate damages in securities action "does not pass <u>Daubert</u> muster").

-13-

defendants' misstatements and omissions, as opposed to other market forces. The question of

loss causation would, therefore, result in a battle of expert witnesses, which in and of itself

weighs in favor of settlement. See, e.g., In re Warner Communications Sec. Litig., 618 F. Supp.

735, 744-45 (S.D.N.Y. 1985), aff'd, 798 F. 2d 35 (2d Cir. 1986) ("it is virtually impossible to

predict with any certainty which [expert's] testimony would be credited, and ultimately, which

damages would be found to have been caused by actionable, rather than the myriad of

nonactionable factors such as general market conditions").

   In view of the immediate and substantial benefits that the proposed Settlement confers on

the Class  ($3.35 million in cash, plus interest), the risk of failure at trial or on appeal (including

the difficulty of establishing a causal link between the Class's damages and defendants'

misconduct, as opposed to other market forces), and the risk that any judgment obtained after

protracted and expensive litigation might not be satisfied, this factor militates strongly in favor of

approving the Settlement. See Isby, 75 F.3d at 1199 (approving district court's settlement, noting

that the district court firmly believed "that plaintiffs' chances for success at trial on the merits

were relatively low when compared to what defendants' offered"); In re Mexico Money Transfer

Litig., 164 F. Supp. 2d at 1017 ("Weighed against these considerations, the settlement proposals

provide a substantial and immediate benefit to class members."); Follansbee, 2000 WL 804690,

at *6 (balance weighed in favor of settlement).

  **2.  Complexity, Length and Expense**

   In determining the fairness of the Settlement, courts also consider "the likely complexity,

length and expense of the litigation." Isby, 75 F.3d at 1199. There is no doubt that this securities

class action involves complex factual and legal issues. As discussed above, the various obstacles

with which the Class would necessarily be confronted "flow from the complexities and

difficulties inherently involved in shareholder securities fraud litigation." In re National Student Marketing Litig., 68 F.R.D. 151, 155 (D.D.C. 1974). Indeed, as many courts have recognized, "[s]ecurities fraud litigation is long, complex and uncertain." Retsky Family Ltd. P'ship, 2001 WL 1568856, at *2 (noting that the likely complexity, length, and expense of further litigation favored approval of the settlement). See also Great Neck Capital, 212 F.R.D. at 409 ("Shareholder class actions are difficult and unpredictable, and skepticism about optimistic forecasts of recovery is warranted.").

If this case were tried rather than settled, the parties would have to conduct and complete a lengthy, extensive, and time-consuming discovery program involving a review and analysis of additional documents, likely numbering in the tens of thousands, from Westell and non-parties. The Class would have to undertake an extensive deposition program, including the depositions of Westell's senior management, employees, former employees, and the Individual Defendants, as well as non-parties such as current and former employees of SBC. These depositions would involve enormous time, effort, and expense by the parties and the deponents. In addition, the parties would have to conduct expert discovery, involving both the preparation of experts' reports and the depositions of the various experts. See In re Mexico Money Transfer Litig., 164 F. Supp. 2d at 1019 ("Further litigation would undoubtedly require additional written discovery and depositions, including expert discovery.").

Assuming the Class's claims survived defendants' inevitable summary judgment motion, trial preparation would result in many additional hours of effort, at great additional expense. Trial of liability issues alone would run several weeks and involve numerous attorneys, experts, the introduction of voluminous documentary and deposition evidence, vigorously contested motions, and the expenditure of enormous amounts of judicial and financial resources. See, e.g.,

Gilbert v. First Alert, Inc., No. 94 C 6760, 1998 WL 142406, at *1 (N.D. Ill. Mar. 24, 1998) ("It is obvious that if a trial had been necessary it would have been complex (the pretrial order raised the specter of conflicting testimony from as many as seven different expert witnesses), lengthy, and expensive for all parties."). The "normal" costs of additional litigation, including copying, travel, depositions, computer support services, and other necessary expenses, would be quite high. Particularly in a complex class action such as this one, those expenses would burden any recovery obtained for the Class immensely, if the Class were ultimately successful, which is by no means assured.

Even if the Class could recover a larger judgment after trial, the additional delay, through trial, post-trial motions, and the appellate process, could last for years. See, e.g., In re Lithotripsy Antritrust Litig., No. 98 C 8394, 2000 WL 765086, at *2 (N.D. Ill. June 12, 2000) ("[P]reparation for trial, trial, and the appellate process would take a longtime [sic]. Recovery for the class plaintiffs, therefore, would not only entail significant risk, it would also take years."). Given the time value of money, a future recovery, even one in excess of the Settlement, might well be less valuable to the Class than the current benefits of the Settlement.

Thus, were this Litigation tried through to conclusion rather than settled, the Litigation would be complex, time-consuming, and expensive, with the chance of obtaining a recovery greater than that provided by the Settlement – or any recovery at all – far from assured. The Settlement secures a substantial $3.35 million benefit for the Class without the delay, risk, and uncertainty of continued litigation, and without the further expense.

### 3. Degree Of Opposition To The Settlement

Notice of the proposed Settlement, as preliminarily approved by the Court on March 31, 2003, was mailed to all Members of the Class starting on April 30, 2003. Additional mailings

-16-

were made pursuant to requests from banks, brokerage firms, and other nominees. In total, 24,190 Notices were mailed to potential Class Members. Additionally, a Summary Notice of the proposed Settlement was published in <u>Investor's Business Daily</u> on May 9, 2003. <u>See</u> Burke Affidavit ¶ 6. The time for members of the Class to object to the Settlement expired on June 4, 2003. Not one objection to the Settlement, Plan of Allocation, or Lead Counsel's fee request has been filed, and only two Class Members, representing 300 shares, have opted out of the Settlement. This complete absence of objections, and virtual absence of exclusions, is persuasive evidence of the fairness of the proposed Settlement. <u>See</u> <u>Retsky Family Ltd. P'ship</u>, 2001 WL 1568856, at *3; <u>Great Neck Capital</u>, 212 F.R.D. at 410 ("A favorable reception by the class is evidence of the fairness of a proposed settlement.").

### 4. <u>The Presence Of Collusion In Gaining A Settlement</u>

No one could credibly suggest that the Settlement is the product of collusion among the parties. Indeed, no one has. As the descriptions of the proceedings above and in the Berg Declaration amply demonstrate, this has been a hard-fought and contentious litigation. Defendants were successful in getting a substantial portion of the Complaint dismissed, and the Settlement was reached only after months of negotiation. Perhaps most significant, the parties agreed to the principal terms of the Settlement only after a full day of difficult negotiations overseen by Magistrate Judge Keys.

As numerous courts have held, the supervision of settlement negotiations by a court or a court-appointed mediator in and of itself demonstrates a lack of collusion. <u>See, e.g.</u>, <u>Liddell v. Board of Educ. of City of St. Louis</u>, No. 4:72CV100 SNL, 1999 WL 33314210, at *6 (E.D. Mo. Mar. 12, 1999) ("The lack of any collusion is further apparent from the facts that the negotiations were protracted and supervised by a court-appointed coordinator."); <u>Vaughns v. Board of Educ.</u>

-17-

of Prince George's County, 18 F. Supp. 2d 569, 579 (D. Md. 1998) (no "breath of collusion"

where "negotiations were protracted and much of the time were . . . supervised by a

Court-appointed mediator"); In re Southern Ohio Correctional Facility, 173 F.R.D. 205, 214

(S.D. Ohio 1997) ("The Settlement was reached as a result of hard-fought and intense,

arms-length negotiations, some of which the Court supervised. The negotiations did not reflect

or suggest any collusion or illegality.").

### 5.    The Opinion Of Competent Counsel

Other than the strength of a plaintiff's case, the most influential factor considered by

courts in evaluating the fairness of a proposed settlement is the opinion of experienced and

competent counsel. See, e.g., Isby, 75 F.3d at 1200 (district court entitled to give consideration

to the opinion of competent counsel that the settlement was fair, reasonable, and adequate);

Retsky Family Ltd. P'ship, 2001 WL 1568856, at *3 ("The Court can consider the opinion of

competent counsel in determining whether a settlement is fair, reasonable and adequate.").

"While the court, of course, should not abdicate its responsibility to review a class action

settlement merely because counsel support it, the court is entitled to rely heavily on the opinion

of competent counsel." Armstrong, 616 F.2d at 325. See also In re Mexico Money Transfer

Litig., 164 F. Supp. 2d at 1020 ("The court places significant weight on the unanimously strong

endorsement of these settlements by Plaintiffs' well-respected attorneys.").

Here, experienced counsel, who have weighed the risks of continued litigation, endorse

the proposed Settlement and the substantial benefits it confers. The Settlement was achieved

through extensive arm's-length negotiations by experienced counsel on both sides, culminating

in a mediation session conducted by Magistrate Judge Keys, following an extensive investigation

of the events and transactions underlying the claims set forth in the Complaint. Lead Counsel,

-18-

who have many years of experience in litigating securities fraud class actions, and who have negotiated numerous class-action settlements that have been approved by state and federal courts throughout the United States, have determined that the Settlement is fair, reasonable, and adequate. Accordingly, this factor weighs heavily in favor of approval.

### 6. The Stage Of The Proceedings And The Amount Of Discovery Completed

To ensure that a plaintiff has had access to sufficient information to evaluate both its case and the adequacy of the settlement proposal, courts in the Seventh Circuit consider the stage of the proceedings and the discovery taken. See, e.g., In re Lithotripsy Antritrust Litig., 2000 WL 765086, at *2 (plaintiffs' counsel was "in an appropriate position to be able to determine the strength of their case and the seriousness of the litigation risks").

As discussed above, the Settlement was reached after more than two years of litigation involving extensive motion practice, including a motion to dismiss, and discovery. In response to Lead Plaintiff's document requests, defendants produced a voluminous number of documents, which Lead Counsel and their experts reviewed, analyzed, organized, and summarized. Lead Plaintiff also subpoenaed and received substantial volumes of documents from the brokerage houses whose analysts followed Westell. Finally, and most importantly, Lead Plaintiff subpoenaed documents from Westell's most important customer, SBC, whose conduct regarding its purchases of Westell modems is at the heart of the case. After Lead Plaintiff was forced to move to compel production from a recalcitrant SBC, the U.S. District Court for the Western District of Texas ordered SBC to comply with the subpoena. In response, SBC produced several thousand pages of responsive documents. Certain documents within the SBC production contained information that was pivotal in the Settlement negotiations.

Based on this extensive litigation and substantial discovery, Lead Counsel are in a very good position to evaluate the strengths and weaknesses of their position responsibly, and to conclude that the proposed Settlement provides a fair, adequate, and reasonable recovery, and an excellent result for the Class. See Isby, 75 F.3d at 1200 (affirming district court's approval of settlement when the district court was satisfied that the discovery and investigation conducted by class counsel before entering into settlement negotiations was extensive and thorough); Great Neck Capital, 212 F.R.D. at 410 ("[T]he settlement was reached after PwC's motion to dismiss had been decided and after merits discovery was well underway. Thus, plaintiffs' counsel's evaluation of the case was based on a reasonable amount of information."); In re Mexico Money Transfer Litig., 164 F. Supp. 2d at 1020 (concluding that class counsel had ample opportunity to reach an informed judgment concerning the merits of the proposed settlement).

## II. THE PLAN OF ALLOCATION IS FAIR AND REASONABLE AND SHOULD BE APPROVED

"A plan of allocation of settlement proceeds in a class action must also be fair and reasonable." Great Neck Capital, 212 F.R.D. at 410 (citing Class Plaintiffs v. City of Seattle, 955 F.2d 1268, 1284 (9th Cir. 1992)). See also Retsky Family Ltd. P'ship, 2001 WL 1568856, at *3 ("The same standards of fairness, reasonableness and adequacy that apply to the settlement apply to the Plan of Allocation."). "'A plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable.'" In re Lloyd's American Trust Fund Litig., No. 96 Civ. 1262, 2002 WL 31663577, at *19 (S.D.N.Y. Nov. 26, 2002) (quoting In re Oracle Sec. Litig., No. C-90-0931-VRW, 1994 WL 502054, at *1 (N.D. Cal. June 18, 1994)). In Great Neck Capital, the court found a plan of allocation to be fair and reasonable because it permitted class members to submit claim forms "evidencing a loss," and "provide[d] an equitable basis for distributing the fund to eligible class members." Id.

-20-

Similarly here, the Plan of Allocation provides that the Net Settlement Fund will be distributed among claimants in a manner proportionate to the losses suffered by all other recognized claimants. At the same time, the Plan of Allocation takes into account that not all losses incurred by Class Members during the Class Period can be shown to have been caused by the misrepresentations and omissions alleged in the Action. The Plan of Allocation recognizes, for example, that on October 26, 2001, the Court dismissed with prejudice the claims of those Class Members who purchased their Westell shares between August 3, 2000 and October 18, 2000. Consequently, the Settlement allocates just ten percent of the Net Settlement Fund to Class Members who purchased their shares during that period, while reserving ninety percent of the Net Settlement Fund for Class Members who purchased their shares between June 27, 2000 through August 2, 2000, and whose claims were sustained. This Plan of Allocation thus provides fair compensation to those Class Members whose claims were dismissed, but who are nonetheless providing Defendants with a release, while preserving the bulk of the Net Settlement Fund (90%) for those Class Members whose claims the Court sustained.

Within each time period (June 27 through August 2, 2000, and August 3 through October 18, 2000), each Authorized Claimant will be paid the percentage of the Net Settlement Fund that the claimant's recognized claim bears to the total of the recognized claims of all Authorized Claimants who purchased during that period.

Based on an analysis of the composition of the Class and the potential claims, Lead Counsel believe that, before the payment of the requested fees and expenses, the average distribution for Class Members who purchased shares of Westell common stock between June 27, 2000 and August 2, 2000 will be approximately $0.35 per share. For Class Members who purchased their shares between August 3, 2000 and October 18, 2000, the average distribution

-21-

per share should be approximately $0.026 per share. A full description of the Plan of Allocation is set forth in the Notice.

Thus, Lead Counsel believe that the Plan of Allocation – to which no Class Member has objected – is fair, reasonable, and equitable to all the Members of the Class.

## III. NOTICE TO THE CLASS MEETS THE REQUIREMENTS OF DUE PROCESS AND RULE 23 OF THE FEDERAL RULES OF CIVIL PROCEDURE

Under Rule 23(c)(2), members of a settlement class are entitled to the "best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Neither Rule 23 nor due process requires "receipt of actual notice by all class members"; rather, "notice should be mailed to the last known addresses of those who can be identified and publication used to notify others . . . ." 2 Newberg on Class Actions § 8.02 (3$^d$ ed.1992) ("Newberg") (citing Manual for Complex Litigation, Second ¶ 30.211 (2$^d$ ed.1985)). See also Burns v. Elrod, 757 F.2d 151, 154 (7th Cir. 1985) (rejecting objection that notice mailed to 10-year-old addresses and published in press violated due process, noting that "Rule 23 does not require defendants to exhaust every conceivable method of identification"). Compliance with the notice requirements of Rule 23(c)(2) satisfies due process because "the adoption of the rule is itself a prima facie judgment that procedures consonant with its language are constitutional." 2 Newberg § 8.04. See also Reynolds v. National Football League, 584 F.2d 280, 285 (8th Cir. 1978) (district court's discretion in fashioning notice "is limited only by the broad 'reasonableness' standards imposed by due process").

The notice program employed here, approved by the Court in the Preliminary Approval Order, required mailing the Notice to identifiable Class Members by first-class mail, and publishing the Summary Notice in a well-known national newspaper. The Notice explained the lawsuit, the Settlement, the Plan of Allocation, the anticipated fee and expense request, and the

-22-

rights and options of Class Members, including their right to opt out of the Class. The published

Summary Notice clearly and concisely provided information concerning the Settlement and the

means to obtain a copy of the full Notice. This notice program, constituting the best practicable

means to notify the Class, complies fully with the requirements of Rule 23 and due process and is

similar to the procedures approved in other cases. See, e.g., Eisen v. Carlisle & Jacquelin, 417

U.S. 156, 173 (1974); Great Neck Capital, 212 F.R.D. at 405 ("Class counsel arranged for notice

to be mailed to potential class members . . . . Notice of the proposed settlement was also

published in the Wall Street Journal."); Mangone v. First USA Bank, 206 F.R.D. 222, 231 (S.D.

Ill. 2001) (notice program similar to that employed here "exceeded the requirements of due

process and F.R.C.P. 23.").

## IV.     THE COURT SHOULD CERTIFY THE CLASS
##         FOR PURPOSES OF THE FINAL SETTLEMENT

As the Supreme Court indicated in Amchem Prods. v. Windsor, 521 U.S. 591, 620

(1997), the certification requirements of Rule 23 of Federal Rules of Civil Procedure, with the

exception of the manageability requirement, must be met even in the context of a settlement

class. See also In re Mexico Money Transfer Litig., 164 F. Supp. 2d at 1012 (certifying a class

for settlement purposes). As Judge Andersen has recently concluded, however, "class

certification is particularly appropriate in securities cases," and "the Seventh Circuit Court of

Appeals has liberally construed Rule 23 in shareholder suits." Levitan v. McCoy, No. 00C5096,

2003 WL 1720047, at *2 (N.D. Ill. Mar. 31, 2003) (citing King v. Kansas City Southern

Industries, Inc., 519 F.2d 20, 25-26 (7th Cir.1975)).

The Court conditionally certified the Class for purposes of settlement in its Preliminary

Approval Order, dated March 31, 2003. Because the requirements of Rule 23 of Federal Rules of

Civil Procedure continue to be met, this certification should be made final.

## A.     The Requirements Of Federal Rule 23(a) Are Satisfied

### 1.     Numerosity

Rule 23(a)(1) requires that the class be so numerous that joinder of all class members would be impracticable. Precise enumeration of the members of the class is not necessary. <u>See In re Mexico Money Transfer Litig.</u>, 164 F. Supp. 2d at 1012. <u>See also Levitan</u>, 2003 WL 1720047, at *3 ("In determining whether a class meets the numerosity requirement, a court can apply common sense to the facts available."). Rather, the Court must examine the facts of the case to determine whether the plaintiff would suffer hardship or inconvenience if joinder were required.

Here, joinder is impracticable. As alleged in the Complaint, more than 41.3 million shares of outstanding Westell common stock were traded on the Nasdaq National Market during the Class Period, constituting an efficient market. From these facts, it is reasonable to conclude that the Class numbers in the thousands. Accordingly, the numerosity requirement of Rule 23(a)(1) has been met. <u>See Levitan</u>, 2003 WL 1720047, at *3 ("Courts in this district have granted class certification to groups smaller than 30.").

### 2.     Commonality

Rule 23(a)(2) provides that a suit may be maintained as a class action if "there are questions of law or fact common to the class." Commonality exists whenever the action arises from a nucleus of operative facts, and the requirement "is readily met in most cases." <u>In re Mexico Money Transfer Litig.</u>, 164 F. Supp. 2d at 1012 (citing <u>Rosario v. Livaditis</u>, 963 F.2d 1013, 1017-18 (7th Cir. 1992); 1 <u>Newberg</u> § 3.10, at 3-50 (3d ed. 1992)). "The commonality requirement has been characterized as a 'low hurdle, easily surmounted.'" <u>Levitan</u>, 2003 WL

-24-

1720047, at *4 (quoting <u>Scholes v. Stone, McGuire & Benjamin</u>, 143 F.R.D. 181, 185 (N.D. Ill. 1992)).

Lead Plaintiff alleges that during the Class Period defendants disseminated misleading information about the financial condition and prospects of Westell, which resulted in the price of Westell's common stock being artificially inflated. The class-wide issues raised by this allegation satisfy the commonality requirement.

### 3. Typicality

Rule 23(a)(3) requires that "the claims . . . of the representative parties [be] typical of the claims . . . of the class." To be typical, "Class members['] claims need not be identical, as long as they are substantially similar." <u>In re Mexico Money Transfer Litig.</u>, 164 F. Supp. 2d at 1013 (citing <u>Binion v. Metropolitan Pier & Exposition Auth.</u>, 163 F.R.D. 517, 524-25 (N.D. Ill. 1995). The typicality requirement is satisfied if, as here, the representative plaintiff's claims "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members and . . . are based on the same legal theory." <u>In re Mexico Money Transfer Litig.</u>, 164 F. Supp. 2d at 1013 (citing <u>De La Fuente v. Stokely-Van Camp, Inc.</u>, 713 F.2d 225, 232 (7th Cir. 1983)). "A finding that commonality exists generally results in a finding that typicality also exists." <u>Levitan</u>, 2003 WL 1720047, at *4.

The essence of Lead Plaintiff's case is that defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by issuing public statements and documents that misrepresented or omitted material facts about Westell's financial condition and prospects. Because the claims of both Lead Plaintiff and the Class are based upon the same theories and will be proven by the same evidence, the "typicality" requirement is met. <u>See, e.g.</u>, <u>In re Mexico Money Transfer Litig.</u>, 164 F. Supp. 2d at 1012-13.

4.      **Lead Plaintiff Will Fairly And**
        **Adequately Represent The Class**

The requirement of Rule 23(a)(4) – that the representative plaintiff "fairly and adequately

protect the interests of the class" – is met if (1) the representative plaintiff does not have claims

that are antagonistic or conflicting with those of the Class, (2) the representative has sufficient

interest in the outcome of the case to ensure vigorous advocacy, and (3) its counsel are

competent, qualified, experienced, and able to vigorously conduct the litigation. See, e.g.,

Levitan, 2003 WL 1720047, at *5; In re Mexico Money Transfer Litig., 164 F. Supp. 2d at 1013.

All these requirements are satisfied here.

Addressing the adequacy test in a securities class action, courts generally focus on the

skill and experience of plaintiff's counsel, rather than the personal qualifications of the named

plaintiff. See, e.g., In re Mexico Money Transfer Litig., 164 F. Supp. 2d at 1013. Here, Lead

Counsel, who are highly experienced in securities class litigation and have successfully

prosecuted many class actions throughout the United States, are clearly competent to conduct this

litigation. Counsel have diligently and aggressively represented their client and the Class before

this Court and in negotiations with defendants' counsel, and have achieved an excellent proposed

settlement of $3.35 million, plus interest.

Further, Lead Plaintiff is an adequate representative. In its sworn certification submitted

in this action (in support of its motion to be appointed lead plaintiff), Lead Plaintiff stated its

willingness to represent the Class. This willingness has been demonstrated by its active

involvement in the successful prosecution of the class action, culminating in a proposed

settlement for the Class of $3.35 million, plus interest. Moreover, there is no inconsistency

between Lead Plaintiff and the Class it represents, and no one has even suggested such an

inconsistency. Uhl, 309 F.3d at 985. Thus, Lead Plaintiff is plainly an adequate representative under Rule 23.

**B.    The Requirements Of Fed. R.
Civ. P. 23(b)(3) Are Satisfied**

Rule 23(b)(3) requires that common issues of law or fact predominate over individual issues, and that a class action be superior to other available methods for the fair and efficient adjudication of the controversy. See, e.g., Levitan, 2003 WL 1720047, at *6; In re Mexico Money Transfer Litig., 164 F. Supp. 2d at 1013. Both requirements are satisfied here.

**1.    Common Questions Of Law And Fact Predominate
Over Individual Questions In This Litigation**

While common questions of law or fact must predominate, they need not be exclusive. Levitan, 2003 WL 1720047, at *6; Scholes v. Moore, 150 F.R.D. 133, 138 (N.D. Ill. 1993). To determine whether common questions predominate, courts look to whether there is a "common nucleus of operative facts." Levitan, 2003 WL 1720047, at *6; Ziemack v. Centel Corp., 163 F.R.D. 530, 535 (N.D. Ill. 1995). "A court should direct its inquiry primarily toward the issue of liability, rather than damages, in determining whether common questions predominate." Levitan, 2003 WL 1720047, at *6 (citing Beale v. EdgeMark Fin. Corp., 164 F.R.D. 649, 658 (N.D. Ill. 1995)).

Here, the pleadings demonstrate the existence of numerous common questions of law and fact, and the Class is united by a common interest in determining whether the defendants' course of conduct was in violation of federal securities laws. This is sufficient to satisfy the predominance requirement. As Judge Andersen wrote in Levitan:

> Defendants' alleged misstatements and omissions of material fact to members of
> the Class are at the core of the Complaint. The issues of law and fact that flow
> from Defendants' alleged misstatements and omissions predominate over any

-27-

individual issue. Therefore, we find that common questions of law and fact predominate.

Levitan, 2003 WL 1720047, at *6.

**2.  A Class Action Is The Superior Method For Adjudication Of The Claims Of The Class**

The class action device is the superior method of litigating this Action for several reasons. See Levitan, 2003 WL 1720047, at *7; In re Mexico Money Transfer Litig., 164 F. Supp. 2d at 1013-14. First, only two Class Members, representing only 300 shares in total, have opted out of the Settlement, demonstrating that there is very little interest among the Class in prosecuting these claims individually. Second, Lead Plaintiff is unaware of any other securities-fraud class action litigation concerning this controversy. Third, it is desirable to concentrate the litigation in one forum, thus avoiding inconsistent adjudications and promoting fairness and efficiency. Finally, this case presents no unusual difficulties in management of the case or notice to the Class. Lead Counsel are very experienced in prosecuting and managing litigation of a similar magnitude and complexity. Accordingly, the "superiority" requirement of Rule 23(b)(3) is met.

Indeed, the class action device is not only a superior method, but also the only feasible one where, as here, many of those who have been injured "are in a poor position to seek legal redress, either because they do not know enough or because such redress is disproportionately expensive." Dolgow v. Anderson, 43 F.R.D. 472, 484-85 (E.D.N.Y. 1968), rev'd on other grounds, 438 F.2d 825 (2d Cir. 1970) (quotation marks omitted). This is particularly so in securities class actions because "'none of the measures available to the [Securities and Exchange] Commission under the Securities Act or the Securities Exchange Act is designed to provide compensation to injured investors for the damages they have suffered.'" Id. at 483 (emphasis by

-28-

court; quoting amicus curiae brief of the SEC). Thus, Lead Plaintiff respectfully submits that the

Court should enter a final order certifying the Class pursuant to Fed. R. Civ. P. 23(a) and

23(b)(3).

**V.     PLAINTIFF'S COUNSEL'S PETITION FOR AN AWARD OF FEES
        AND REIMBURSEMENT OF EXPENSES SHOULD BE GRANTED**

      **A.     The Standards In The Seventh Circuit
        For Awarding Class Counsel Fees**

Both the Supreme Court and the Seventh Circuit have long recognized that attorneys who

represent a class and aid in the creation of a settlement fund are entitled to compensation for legal

services from the settlement fund. Under this "equitable" or "common fund" doctrine

established more than a century ago in Trustees v. Greenough, 105 U.S. 527 (1881), attorneys

who create a common fund to be shared by a class are entitled to an award of fees and expenses

from that fund as compensation for their work. See also Boeing Co. v. Van Gemert, 444 U.S.

472, 478 (1980); Mills v. Electric Auto-Lite Co., 396 U.S. 375, 392 (1970); Florin v.

Nationsbank of Georgia, N.A., 34 F.3d 560, 563 (7th Cir. 1994) (Florin I) ("When a case results

in the creation of a common fund for the benefit of the plaintiff class, the common fund doctrine

allows plaintiffs' attorneys to petition the court to recover its fees out of the fund.").

Courts have also recognized that in addition to providing just compensation, awards of

attorneys' fees from a common fund serve to encourage skilled counsel to represent those who

seek redress for damages inflicted on entire classes of persons, and to discourage future

misconduct of a similar nature. Indeed, the Supreme Court has emphasized that private securities

actions provide a "'most effective weapon in the enforcement' of the securities laws and are 'a

necessary supplement to [SEC] action.'" Bateman Eichler, Hill Richards, Inc. v. Berner, 472

U.S. 299, 310 (1985) (quoting J.I. Case Co. v. Borak, 377 U.S. 426, 432 (1964)).

The Court of Appeals for the Seventh Circuit has "held repeatedly that, when deciding on appropriate fee levels in common-fund cases, courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." In re Synthroid Marketing Litig., 264 F.3d 712, 718 (7th Cir. 2001) ("Synthroid I"). See also In re Synthroid Marketing Litig., 325 F.3d 974, 975 (7th Cir. 2003) ("Synthroid II") ("A court must give counsel the market rate for legal services . . . ."); In re Continental Ill. Sec. Litig., 962 F.2d 566, 572 (7th Cir. 1992) ("The object in awarding a reasonable attorney's fee, as we have been at pains to stress, is to give the lawyer what he would have gotten in the way of a fee in an arms' length negotiation, had one been feasible.").

The two most common approaches to determining the hypothetical market price of attorneys' fees in common-fund class actions are the "percentage-of-the-recovery" method and the "lodestar" method. Great Neck Capital, 212 F.R.D. at 411. Under the percentage-of-the-recovery method, class counsel is awarded a fee equal to a specific percentage of the recovery, as in a typical market-based contingency-fee arrangement. Id. Under the lodestar method, the number of hours expended by counsel is multiplied by the hourly rate normally charged for similar work by attorneys of like skill in the area. The final fee is then determined using other less objective criteria, such as the risk of not prevailing in the lawsuit. Id.

Although the Seventh Circuit has stated that "the decision whether to use a percentage method or a lodestar method remains in the discretion of the district court," it has also recognized that there are advantages to the percentage-of-the-recovery method, including its relative objectivity and ease of its application. See Florin I, 34 F.3d at 566; see also Great Neck Capital, 212 F.R.D. at 411. The Seventh Circuit has noted, for example, that it is easier to establish marketplace contingency fee percentages "than it would be to hassle over every item or category

-30-

of hours and expense and what multiple to fix and so forth." <u>Continental</u>, 962 F.2d at 573. <u>See</u>
<u>also</u> <u>Gaskill v. Gordon</u>, 942 F. Supp. 382, 386 (N.D. Ill. 1996), <u>aff'd</u>, 160 F.3d 361 (7th Cir.
1998) ("[T]he percentage of the fund method provides a more effective way of determining
whether the hours expended were reasonable.").

The Private Securities Litigation Reform Act of 1995 (the "PSLRA") also supports the
use of the percentage-of-the-recovery method. <u>See</u> 15 U.S.C. § 78u-4(a)(6) ("Total attorneys'
fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a
reasonable percentage of the amount of any damages and prejudgment interest actually paid to
the class."). "[A]ny fee and expense award [under the PSLRA] is expressly limited to a
reasonable percentage of the recovery, making <u>the outcome rather than the number of hours</u>
<u>expended on legal work the key</u>." <u>In re Waste Mgmt., Inc. Sec. Litig.</u>, 128 F. Supp. 2d 401, 423
(S.D. Tex. 2000) (emphasis added). After using the percentage-of-the-recovery method to
determine the fee, its reasonableness may be confirmed by a lodestar "cross-check." <u>See, e.g.</u>, <u>In</u>
<u>re Sears Retiree Group Life Ins. Litig.</u>, No. 97 C 7453, 2002 WL 475180, at *2 (N.D. Ill. Mar.
27, 2002) ("a look to the lodestar amount is a wholesome check on the reasonableness of this
percentage recovery").

Here, Plaintiff's Counsel's requested attorneys' fees are reasonable and amply supported
under both the percentage-of-the-recovery method and the lodestar/multiplier method.

      **B.**     **The Requested Fee Is Reasonable And**
                **<u>Appropriate As A Percentage Of The Common Fund</u>**

           **1.**     **The Proposed Fee Of One-Third Is Entirely Consistent**
                      **<u>With Seventh Circuit Authority And Authority Nationwide</u>**

In <u>Gaskill</u>, a class action involving a pyramid real-estate investment scheme, the Court of
Appeals for the Seventh Circuit affirmed a fee of roughly $8 million, representing 38% of the

recovery. See Gaskill, 160 F.3d at 362. The percentage sought here, one-third of the $3.35 million Settlement Fund, is therefore entirely consistent with recent Seventh Circuit precedent.

District courts in this Circuit have routinely awarded attorneys' fees in the range of 33.33% and more. See, e.g., First Interstate Bank of Nevada, N.A. v. National Republic Bank of Chicago, No. 80 C 6401 (N.D. Ill. Feb. 12, 1988) (39% of a $3,575,000 settlement, amounting to a $1.4 million fee) (Exhibit A); Weiner v. Quaker Oats Co., No. 98 C 3123 (N.D. Ill. Sept. 14, 2001) (33.33% of settlement, amounting to a $3,366,667 fee) (Exhibit B); Kaufman v. Motorola, Inc., No. 95-CV-1069 (N.D. Ill. May 24, 2001) (33.33% of settlement, amounting to a $8,333,333 fee) (Exhibit C); In re Nanophase Techs. Corp. Sec. Litig., No. 98 C 3450 (N.D. Ill. Mar. 27, 2001) (33.33% of settlement, amounting to a $1,341,532 fee) (Exhibit D); In re First Merchants Acceptance Corp. Sec. Litig., No. 97 C 2715 (N.D. Ill. Apr. 21, 2000) (33.33% of settlement, amounting to a $2,895,178 fee) (Exhibit E); In re Nuveen Fund Litig., No. 94 C 360 (N.D. Ill. June 3, 1997) (33.33% of settlement, amounting to a $8 million fee) (Exhibit F); In re Soybean Futures Litig., No. 89 C 7009 (N.D. Ill. Nov. 27, 1996) (33.33% of settlement, amounting to a $7,166,666 fee) (Exhibit G); Goldsmith v. Tech. Solutions Co., No. 92 C 4374, 1995 WL 17009594, at *8 (N.D. Ill. Oct. 10, 1995) ("where the percentage method is utilized, courts in this District commonly award attorneys' fees equal to approximately one-third or more of the recovery"; 33.33% of a $4.6 million settlement, amounting to a $1,533,333 fee ) (citations omitted); Liebhard v. Square D Co., No. 91 C 1103 (N.D. Ill. Jun. 6, 1993) (33.33% of settlement, amounting to a $2.5 million fee) (Exhibit H); In re Spyglass, Inc. Sec. Litig., No. 99 C 0512 (N.D. Ill. May 23, 2000) (33.00% of settlement, amounting to a $511,500 fee) (Exhibit I); In re Caremark Intern. Sec. Litig., No. 94 C 4751 (N.D. Ill. Dec. 15, 1997) (fee award of 33.00% of settlement fund) (Exhibit J).

-32-

Similarly, numerous courts nationwide have approved and awarded fees of 33.33% or more of the recovery, in recognition of the substantial services performed by counsel and the risks undertaken. See, e.g., In re Airline Ticket Comm'n Antitrust Litig., 953 F. Supp. 280 (D. Minn. 1997) (33.33% for $28 million fee); Waters v. International Precious Metals Corp., 190 F.3d 1291 (11th Cir. 1999) (33.33% for $13.3 million fee); In re Medical X-Ray Film Antitrust Litig., No. CV-93-5904, 1998 WL 661515 (E.D.N.Y. Aug. 7, 1998) (33.33% for $13.12 million fee); Cimarron Pipeline Const. Inc. v. National Council on Comp. Ins., Nos. Civ. 89-822-T, Civ 89-1186-T, 1993 WL 355466 (W.D. Okla. Jun. 8, 1993) (33.33% for $11.66 million fee); In re Public Serv. Co. of New Mexico, No. 91-0536M, 1992 WL 278452 (S.D. Cal. July 29, 1992) (33% for $10.5 million fee); In re Crazy Eddie Sec. Litig., 824 F. Supp. 320 (E.D.N.Y. 1993) (33.8% for $14.2 million fee); In re Wedtech Sec. Litig., MDL 735 (S.D.N.Y. July 31, 1992) (cited in Crazy Eddie, 824 F. Supp. at 326) (33.33% for $17.6 million fee).

### 2. The Proposed Fee Is Appropriate Because Petitioners Faced A Substantial Risk Of Non-Payment

As noted above, the Seventh Circuit has held that a court deciding on an appropriate fee in a common-fund case should consider "the risk of nonpayment." Synthroid I, 264 F.3d at 718. See also Florin I, 34 F.3d at 565 ("A court must assess the riskiness of the litigation by measuring the probability of success of this type of case at the outset of the litigation.") (emphasis added; citations omitted).

From the outset, there existed the significant possibility that Plaintiff's Counsel would obtain no recovery – and hence no compensation. Indeed, even if the Class had continued the litigation and obtained a substantially higher judgment, a risk existed that any such judgment would be uncollectible, and that Plaintiff's Counsel, despite significant effort, would receive no compensation.

-33-

The record shows that the Class would have had to overcome significant factual and legal obstacles to establish defendants' liability. The Class would have had to prove scienter, materiality, damages, and causation, and to defeat other procedural and substantive defenses afforded by the PSLRA, See In re Ikon Office Solutions, Inc. Sec. Litig., 194 F.R.D. 166, 194 (E.D. Pa. 2000) ("The court also acknowledges that securities actions have become more difficult from a plaintiff's perspective in wake of the PSLRA."). Indeed, defendants asserted strong defenses to the Complaint, some of which prevailed on their motion to dismiss. See Skelton v. General Motors Corp., 860 F.2d 250, 253 (7th Cir. 1988) ("The stronger the defense, the higher the risk involved in bringing the suit . . . .").

Although Plaintiff's Counsel were not "assured of a paycheck" (Florin v. Nationsbank of Georgia, N.A., 60 F.3d 1245, 1247 (7th Cir. 1995) ("Florin II")), they nonetheless risked more than 1,600 hours of labor and incurred $129,719 in out-of-pocket expenses. Unlike defendants' counsel, who were paid on a non-contingent basis, Plaintiff's Counsel have received no compensation for their considerable efforts on behalf of the Class. Yet, like defendants' counsel, Plaintiff's Counsel have had to meet a payroll and timely pay their rent and other bills.[2] Thus, the element of risk strongly weighs in favor of the requested fee.

---

[2]Moreover, this suit did not follow a government case charging civil or criminal liability. See In re Gulf/Oil Cities Service Tender Offer Litig., 142 F.R.D. 588, 597 (S.D.N.Y. 1992) ("[T]his is not a case where plaintiffs' counsel can be cast as jackals to the government's lion, arriving on the scene after some enforcement or administrative agency has made the kill."); In re Ikon Office Solutions, 194 F.R.D. at 194. As there has been no governmental effort to redress the underlying circumstances, this litigation provided the only realistic avenue for Class Members to vindicate their rights as against the defendants.

**3.    The Proposed Fee Is Appropriate Because Petitioners' Services
        Resulted In An Excellent Settlement And Were Of High Quality**

Petitioners further submit that they rendered effective representation to the Class.

Plaintiff's Counsel were confronted with a significant number of difficult legal and tactical issues

throughout the course of this case. The fact that Plaintiff's Counsel, confronted with these

obstacles, were able to secure a $3.35 million cash settlement demonstrates the high quality of

their performance. See In re Ikon Office Solutions, 194 F.R.D. at 194 ("The most significant

factor in this case is the quality of representation, as measured by 'the quality of the result

achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience

and expertise of the counsel, the skill and professionalism with which counsel prosecuted the

case and the performance and quality of opposing counsel.'") (citation omitted); In re Equity

Funding Corporation of America Sec. Litig., 438 F. Supp. 1303, 1337 (C.D. Cal. 1977) (the

quality of the work "necessarily includes the difficulty of the task performed"); In re Warner

Communications Sec. Litig., 618 F. Supp. at 748. The settlement is an outstanding result in both

absolute terms and when balanced against the multitude of risks facing the Class.[3]

---

[3]The quality of defense provided by opposing counsel is considered in the quality of the result
produced by attorneys for a class. See In re Prudential Sec. Inc. Ltd. P'hip Litig., 912 F. Supp.
97, 103 n.17 (S.D.N.Y. 1996). Plaintiff's Counsel here squared off against highly competent
firms such as McDermott, Will & Emery, and devoted the time and money necessary to
prosecute the Action to a successful conclusion. Plaintiff's Counsel's standing and experience
are similarly relevant in considering the application for counsel fees. See In re Warner
Communications Sec. Litig., 618 F. Supp. at 749. Plaintiff's Counsel have considerable
experience in complex securities-fraud class actions, as well as the resources necessary to
prosecute this Action through trial and beyond. See the resumés attached to the Berg Declaration
and the Declaration of Carol V. Gilden, submitted herewith.

-35-

**4.    The Reaction Of The Class
Favors The Requested Award**

No Class Member has objected to the requested fee of one-third of the Settlement Fund.

As numerous courts have recognized, "[t]he lack of objection from the members of the class is

one of the most important [factors in awarding attorneys' fees.]" In re General Public Utils. Sec.

Litig., No. 79-1420, 1983 WL 22362, at *8 (D.N.J. Nov. 16, 1983). See also In re Art Materials

Antitrust Litig., MDL Docket No. 436, 1983 WL 1947, at *3-4 (N.D. Ohio Dec. 27, 1983);

Ressler v. Jacobson, 149 F.R.D. 651, 656 (M.D. Fla. 1992); Slomovics v. All For A Dollar, Inc.,

906 F. Supp. 146, 150 (E.D.N.Y. 1995) (citing Weiss v. Drew Nat. Corp., 465 F. Supp. 548, 551

(S.D.N.Y. 1979)); In re SmithKline Beckman Corp. Sec. Litig., 751 F. Supp. 525, 533 (E.D. Pa.

1990); Mashburn v. National Healthcare, Inc., 684 F. Supp. 679, 695 (M.D. Ala. 1988); Pavlidis

v. New England Patriots Football Club, Inc., 675 F. Supp. 707, 711 (D. Mass. 1987).

In sum, the one-third award requested here is reasonable and well justified in light of the

substantial benefit of $3.35 million, plus interest, conferred on the Class, the significant

contingent risks faced in the litigation, the quality of work performed by Plaintiff's Counsel, and

the range of awards typically granted in cases of this nature.  Plaintiff's Counsel respectfully

submit that they "invested time and money in this case, and [that they] well deserve the payment

they request." In re Gulf/Oil Cities Service Tender Offer Litig., 142 F.R.D. 588, 597 (S.D.N.Y.

1992).

**C.    The Requested Fee Is also
Reasonable Under A Lodestar Check**

Courts applying the percentage method can, if desired, utilize the lodestar method as a

cross-check on the appropriate percentage to award.  See, e.g., In re Brand Name Prescription

Drugs Antitrust Litig., No. 94 C 897, 2000 WL 204112, at *3 (N.D. Ill. Feb. 10, 2000).  Such a

check might be appropriate, for example, in a "coupon" settlement, where "the nature of the settlement evades the precise evaluation needed for the percentage of recovery method." In re GMC Pick-Up Truck Fuel Tank Prod. Liab. Litig., 55 F.3d 768, 821 (3d Cir. 1995). Because the value of the cash settlement here is precisely known, such a cross-check is less important. Nonetheless, a lodestar cross-check confirms the fairness and reasonableness of the fee requested.

The Lodestar Reports attached to the Berg Declaration (as Exhibit 2) and to the Declaration of Carol V. Gilden, submitted herewith, show that Class Counsel expended more than 1,600 hours of professional time in the prosecution of this litigation through June 2, 2003. These hours have been multiplied by the current hourly rates[4] of the attorneys and paralegals[5] who worked on the litigation to arrive at the base lodestar amount of $ (through June 2, 2003). The Lodestar Reports detail the calculation of these hours, which were compiled from contemporaneous time records maintained by each attorney, paralegal, or other professional participating in the litigation. Copies of contemporaneous time records are available for the Court's review.

The requested joint fee of $1,116,667 represents a 1.48 multiplier to Plaintiff's Counsel's aggregate lodestar. Such a multiplier is exceedingly modest in light of the tremendous risk of

---

[4]Application of current hourly rates is appropriate in calculating the lodestar figure. See Skelton, 860 F.2d at 255 n.5 ("The courts in this circuit generally use current rates."); In re Washington Public Power Supply Sys. Sec. Litig.,19 F.3d 1291, 1305 (9th Cir. 1994), aff'd in part sub nom. Class Plaintiffs v. Jaffe & Schlesinger, P.A., 19 F.3d 1306 (9th Cir. 1994) ("Full compensation requires charging current rates for all work done during the litigation, or by using historical rates enhanced by an interest factor.").

[5]Since it is customary to bill paralegals at hourly rates, their time should accordingly be compensated. Continental, 962 F.2d at 569. Many courts have noted the economic value of using paralegals to do work that would otherwise be performed by attorneys. See id.; United States Football League v. National Football League, 887 F.2d 408, 416 (2d Cir. 1989).

-37-

non-payment borne by Plaintiff's Counsel (as described above in Section V.B.2). See, e.g., Skelton, 860 F.2d at 253 ("The stronger the defense, the higher the risk involved in bringing the suit and the greater the multiplier necessary to compensate plaintiff's attorney for bringing the action."). As the Seventh Circuit has emphasized, "[courts] must . . . be careful to sustain the incentive for attorneys to continue to represent such clients on an 'inescapably contingent' basis." Florin II, 60 F.3d at 1247 (citations omitted). Accordingly, "a risk multiplier is not merely available in common fund cases but mandated, if the court finds that counsel 'had no sure source of compensation for their services.'" Florin I, 34 F.3d at 565 (emphasis added; citing Continental, 962 F.2d at 569). "[C]ourts use a risk multiplier to compensate the attorneys for the risk that they will not be paid if the litigation is unsuccessful. The risk multiplier is an effort to mimic market forces." Florin II, 60 F.3d at 1247; see also Gaskill v. Gordon, 160 F.3d at 363. ("Because they shift part of the risk of loss from the client to the lawyer, contingent-fee contracts usually yield a larger fee in a successful case than an hourly fee would.").

Thus, the modest multiplier of 1.48 is fully justified to compensate Plaintiff's Counsel for the contingent risk they faced. See In re Brand Name Prescription Drugs, 2000 WL 204112, at *3 (awarding $91 million premium above lodestar: "An award of more than two times the lodestar calculation is believed to be fair and just in these circumstances."); Florin II, 60 F.3d at 1247 (finding 1.01 multiplier an abuse of discretion and directing district court to award 1.53 multiplier).[6]

---

[6]See also In re Prudential Ins. Co., 148 F.3d 283, 341 (3d Cir. 1998) ("[M]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied") (quoting 3 Newberg on Class Actions (3d Ed. 1992) § 14.03 at 14-5); In re NASDAQ Market-Maker Antitrust Litig., 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (lodestar cross-check; $143,780,000 fee for a 3.97 multiplier); In re Prudential Ins. Co. of America Sales Practices Litig., 106 F. Supp. 2d 721, 736 (D.N.J. 2000) (lodestar cross-check; $90,000,000 fee for a 2.13 multiplier); Broin v. Philip Morris, No. 91-49738 CA (Dade Cir. Ct. Feb. 6, 1998), aff'd sub

### D. Plaintiff's Counsel Are Entitled To Reimbursement Of Their Reasonable Expenses Incurred In Prosecuting This Litigation

Courts regularly award reimbursement of reasonable expenses that were necessarily incurred. See Spicer v. Chicago Bd. Options Exchange, Inc., 844 F. Supp. 1226, 1256 (N.D. Ill. 1993); Miltland Raleigh-Durham v. Myers, 840 F. Supp. 235, 239 (S.D.N.Y. 1993) ("Attorneys may be compensated for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long as they 'were incidental and necessary to the representation' of those clients.") (citation omitted). In the prosecution of this litigation, Plaintiff's Counsel have advanced litigation costs and expenses in the amount of $129,719.[7] These costs and expenses are consistent with those awarded in complex class actions of this nature. Cf. Ikon Office Solutions,

---

nom. Ramos v. Philip Morris Cos., 743 So. 2d 24 (Fla. Ct. App. 3d Dist. 1999) ($47,016,200 fee for a 5.0 multiplier); Kurzweil v. Philip Morris Co., Nos. 94 Civ. 2373, 94 Civ. 2546, 1999 WL 1076105 (S.D.N.Y. Nov. 30, 1999) ($37,146,029 fee for a 2.46 multiplier); In re Sumitomo Copper Litig., 74 F. Supp. 2d 393 (S.D.N.Y. 1999) ($32,065,000 fee for a 2.5 multiplier); In re Ikon Office Solutions, Inc. Sec. Litig., 194 F.R.D. 166 (E.D. Pa. 2000) (multiplier calculated as cross-check; $32,404,744 fee for a 2.7 multiplier); In re Shell Oil Refinery, 155 F.R.D. 552, 573-74 (E.D. La. 1993) ($31,846,795 fee for a 3.25 multiplier); Willson v. New York Life Ins. Co., No. 94/127804, 1995 N.Y. Misc. LEXIS 652 (Sup. Ct. N.Y. Co. Nov. 8, 1995), aff'd without opinion, 228 A.D.2d 368 (1st Dep't 1996) ($21,123,436 fee for a 4.6 multiplier); Michels v. Phoenix Home Life Mutual Ins. Co., No. 95/5318, 1997 WL 1161145 (N.Y. Sup. Ct. Albany Co., Jan. 3, 1997) ($9,000,000 fee for a 3.3 multiplier); Conley v. Sears, Roebuck & Co., 222 Bankr. 181 (D. Mass. 1998) ($7,500,000 fee for a 8.9 multiplier); Kuhnlein v. Department of Revenue, 662 So. 2d 309 (Fla. 1995) ($6,477,467.50 fee for a 5.0 multiplier); In re SmithKline Beckman Corp. Sec. Litig., 751 F. Supp. 525 (E.D. Pa. 1990) ($5,692,250 fee for a 3.29 multiplier); Elkins v. Equitable Life Ins. Co. of Iowa, No. Civ A-96-296-Civ-T-17B, 1998 WL 133741 (M.D. Fla. Jan. 28, 1998) ($5,000,000 fee for a 2.34 multiplier); Rabin v. Concord Assets Group, Inc., No. 89 Civ. 6130, 1991 WL 275757, at *2 (S.D.N.Y. Dec. 19, 1991) ($2,400,000 fee for a 4.4 multiplier).

[7] Of this total, expenses of Plaintiffs' Lead Counsel amounted to $84,328.18; expenses of other Plaintiff's Counsel, not in lead positions, amounted to $45,390.85. See Exhibits 3-5 to the Berg Declaration.

194 F.R.D. at 192 ($3.5 million); Shaw v. Toshiba Amer. Info. Syst. Inc., 91 F. Supp. 2d 942,

973 (E.D. Tex. 2000) ($3 million).

## **CONCLUSION**

Without any assurance of success, the Class and its Counsel have pursued this Action to a

successful conclusion, with an exceptional result.  Based upon the foregoing, Plaintiff's Counsel

respectfully ask the Court to approve both the Settlement and the requested award of attorneys'

fees and reimbursement of expenses.

Dated:  June 11, 2003

**MUCH SHELIST FREED DENENBERG
AMENT & RUBENSTEIN, P.C.**


By: _Carol U Gilden_
     Carol V. Gilden
     191 North Wacker Drive
     Suite 1800
     Chicago, Illinois  60606-1615
     (312) 521-2000

**Liaison Counsel for the Class**


**BERNSTEIN LIEBHARD
& LIFSHITZ, LLP**


By: _Robert J. Berg_
     Stanley D. Bernstein
     Robert J. Berg
     Mark T. Millkey
     Mary U. Hoover
     10 E. 40th Street
     New York, New York  10016
     (212) 779-1414

**Lead Counsel for the Class**

# SEE CASE FILE FOR EXHIBITS